**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jesus Dario GONZALEZ, aka Adrian Magdaleno, aka Jesse Gonzalez,
Defendant–Appellant.**

No. 02–50160.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 2003.

Filed May 5, 2003.

---

Jacqueline Chooljian and Kevin Lally, Assistant United States Attorneys, attorneys for the plaintiff-appellee.

Before PREGERSON, THOMAS and RAWLINSON, Circuit Judges.

## OPINION

THOMAS, Circuit Judge.

Does the Fourth Amendment protect those who wish to hide in plain sight? Under the circumstances presented in this appeal, we conclude it does not and affirm the district court's denial of the defendant's suppression motion.

### I

A Federal Express employee noticed something out of the ordinary about a package in the Brussels, Belgium warehouse. The alert Brussels scout notified Belgium Customs officials who examined the parcel, which was addressed to "Dr. Miller" at Kaiser Permanente Medical Center in Bellflower, California. It contained MDMA, which turned out not to be materials concerning a physician with a master's degree, but rather 20,000 methylenedioxymethamphetamine (or, to use its street name, "ecstacy") tablets, concealed in video cassette boxes. To investigate this apparent "fed-ecstacy" scheme, Belgium Customs notified the United States Drug Enforcement Administration ("DEA") Belgium Country Office and requested the agency's assistance in effectuating a controlled delivery. The Los Angeles Field Division of the DEA agreed to conduct the requested controlled delivery.

DEA Special Agent Deanne Reuter then met with Roy Hill, the Area Director of Security Services for Kaiser Permanente and requested cooperation. Hill consulted the hospital's administration, which granted its full consent for the DEA to conduct a controlled delivery of the parcel on hospital grounds. After discussion of how best to conduct the delivery, Hill and Reuter agreed that because the MDMA was packaged in a Federal Express parcel, suspicion would not be aroused if delivery were made to the material management services mailroom. According to Hill, all packages received by and sent from the hospital were channeled through this mailroom so they could be logged and distributed.

The DEA obtained a warrant to install into the parcel an electronic tracking device and an agent alert device which would emit a signal when the parcel was opened. According to Reuter, the warrant was obtained so that the parcel could be monitored as it traveled throughout the hospital, including personal desks and areas where employees potentially possessed a legitimate expectation of privacy. However, no warrant was sought for the audiovisual equipment the DEA intended to use to surveil the mailroom. Reuter maintained that no warrant was necessary because the DEA had been assured that it was a quasi-public room in which hospital employees did not possess a reasonable expectation of privacy. On the morning of the controlled delivery, the DEA installed a covert video camera in the mailroom, positioned to face the mailroom desk which had been selected to receive delivery of the package.

The DEA then provided the package, complete with the enclosed tracking devices, to hospital security for delivery to the mailroom, as this was the customary manner in which parcels received after

normal business hours were delivered to the mailroom. Security then notified the mailroom that a package had been delivered over the weekend; mailroom personnel asked security to bring the parcel down. In anticipation of this delivery, the receiver on the camera was activated. The receiving clerk, Jesse Standifer, accepted the package.

Approximately half an hour later, defendant Jesus Dario Gonzalez entered the mailroom. He is depicted on the tape leaning over the package with Standifer. Standifer picked up the package and shook it; he and Gonzalez then took the package to the rear of the mailroom where it was placed on a pallet marked "other deliveries," yet set apart from where other packages received that day had been placed. Gonzalez and Standifer returned to Standifer's desk. An ecstatic Gonzalez is then shown clapping his hands and acting in a manner usually reserved for post-touchdown end zone celebrations. Next, he and Standifer shook hands and engaged in a brief discussion before Gonzalez left the mailroom.

About fifteen minutes later, the DEA requested hospital security's assistance in locating Gonzalez, since he had handled the package in a "suspicious manner." Hospital personnel found Gonzalez, and informed him that the DEA wished to speak with him; he was interviewed by DEA and U.S. Customs agents in a room selected by the hospital. When asked about the parcel he and Standifer had placed on the back pallet, Gonzalez at first feigned ignorance until he was shown the videotape. He then claimed that his conversation with Standifer focused on the unusual shape of the parcel. This explanation aroused the suspicions of the agents, since the parcel was a conventional, unaltered mailing package.

Gonzalez was then advised of his *Miranda* rights. During the interrogation that followed, Gonzalez changed his story three times, implicating himself in the scheme each time. He was then arrested and removed from the hospital premises. He was charged with possession with intent to distribute 3,617 grams of MDMA in violation of 21 U.S.C. § 841(a)(1).

After entering a plea of not guilty, Gonzalez moved to suppress the videotape on the ground that it was obtained without a warrant in violation of his Fourth Amendment rights. After conducting a hearing, the district court denied his motion to suppress. After another hearing, the district court also denied his motion for reconsideration. Gonzalez then entered a plea of guilty, conditioned on his being able to appeal the district court's adverse determination of his motion to suppress. The court entered judgment against Gonzalez, imposing a sentence of 41 months imprisonment. This timely appeal follows.

## II

■ The threshold inquiry in any Fourth Amendment analysis is whether the government's conduct is included in the Amendment's coverage, in other words, whether it amounts to a "search" for constitutional purposes. *See* 1 William E. Ringel, Searches and Seizures, Arrests and Confessions, § 8.1 (2nd ed.2000). "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576(1967) (Harlan, J., concurring)). In this case, the district court concluded that the expectation of privacy in a hospital mailroom used by the public "is not one that society recognizes as reason-

able in light of the facts and circumstances." The district court also concluded that the fact that the surveillance was conducted by videocamera did not change the privacy analysis. We agree.

## A

A person's "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

 Here, the space was a large, quasi-public mailroom at a public hospital during ordinary business hours. The mailroom has two doors—one that opens into the interior of the hospital and a large loading bay door. Both doors remain open throughout the business day. The room also has large windows through which the room is visible from the outside. The area receives heavy foot traffic during business hours. Both scheduled and unscheduled pickups and deliveries occur. It is accessed frequently by at least 50 hospital employees and it is open to any of the hospital's 800 employees who are permitted to deliver or retrieve packages. Gonzalez did not have the means or the authority to exclude others from the premises. In fact, as a transportation orderly, he was one of the few hospital employees who lacked a legitimate employment-related reason to enter the mailroom, although he was not prohibited from being there.

Between the time the package was initially delivered to the mailroom and when Gonzalez arrived half an hour later, nine people can be seen on the videotape entering the mailroom for various lengths of time. During the time Gonzalez and Standifer were in the mailroom, three other individuals were present in the room for varying lengths of time, including DEA Agent Hutchinson. The videotape reveals a fellow hospital employee walking through the mailroom during the time Gonzalez and Standifer were huddled over the package of contraband.

Gonzalez contends that a temporary zone of privacy was created when he was alone with Standifer. It is doubtless true that "the Fourth Amendment protects persons, not places." *Katz,* 389 U.S. at 351, 88 S.Ct. 507. However, "the extent to which the Fourth Amendment protects people may depend upon where those people are." *Carter,* 525 U.S. at 88, 119 S.Ct. 469. "Property used for commercial purposes is treated differently from residential property." *Id.* at 90, 119 S.Ct. 469. Although "an individual can have a legitimate expectation of privacy in a commercial area," *United States v. Silva,* 247 F.3d 1051, 1055 (9th Cir.2001) (citation omitted), that legitimate expectation is less than one would have while on residential property. *Carter,* 525 U.S. at 90, 119 S.Ct. 469 (citing *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)). Indeed, "[a]n individual whose presence on another's premises is purely commercial in nature ... has no legitimate expectation of privacy in that location." *United States v. Gamez–Orduno,* 235 F.3d 453, 458 (9th Cir.2000) (citation omitted). Public hospitals, by their nature, are institutions not only accessible to the community, but places in which the needs of security and treatment create a diminished expectation of privacy. The use of surveillance cameras in hospitals for patient protection, for documentation of medical procedures and to prevent theft of prescription drugs is not uncommon. Indeed, under the circumstances presented by that case, we have

548

held that a defendant arrested and taken to the hospital had no objectively reasonable expectation of privacy in his hospital room. *United States v. George,* 987 F.2d 1428, 1432 (9th Cir.1993). Of course, one may have an objectively reasonable expectation of privacy in private work areas "given over to [an employee's] exclusive use." *United States v. Taketa,* 923 F.2d 665, 671 (9th Cir.1991) (quoting *Schowengerdt v. General Dynamics,* 823 F.2d 1328, 1335 (9th Cir.1987) (alterations in *Taketa*)). Here, however, the defendant had no designated private work space and chose to conduct his criminal activity in a public area.

Gonzalez would have us adopt a theory of the Fourth Amendment akin to J.K. Rowling's Invisibility Cloak, to create at will a shield impenetrable to law enforcement view even in the most public places. However, the fabric of the Fourth Amendment does not stretch that far. He did not have an expectation of privacy in the public mailroom that society would accept as reasonable.

**B**

■ The fact that the surveillance was conducted by video camera does not alter our conclusion. To be sure, video surveillance is subject to higher scrutiny under the Fourth Amendment. *Taketa,* 923 F.2d at 675. A person has a stronger claim to a reasonable expectation of privacy from video surveillance than against a manual search. *Id.* at 677. Thus, we have held that the Fourth Amendment forbids warrantless videotaping of a private office, *id.* at 678, and hotel rooms, *see United States v. Nerber,* 222 F.3d 597, 604 (9th Cir.2000).

■ However, "[v]ideo surveillance does not in itself violate a reasonable expectation of privacy." *Taketa,* 923 F.2d at 677. Indeed, "[v]ideotaping of suspects in public places, such as banks, does not violate the fourth amendment; the police may record what they normally may view with the naked eye." *Id.* (citations omitted). We have not defined the precise contours of Fourth Amendment protection in the video context. However, in this case, given the public nature of the mailroom in a community hospital where individuals—even DEA agents—strolled nearby without impediment during the transaction, we conclude the defendant had no objectively reasonable expectation of privacy that would preclude video surveillance of activities already visible to the public.

**III**

Perhaps, as Edgar Allen Poe put it in the *Purloined Letter,* the best way to conceal something is to employ "the comprehensive and sagacious expedient of not attempting to conceal it at all." By taking delivery of contraband in the public mailroom of a community hospital, the defendant might well have succeeded in concealing his criminal acts. However, even though the Fourth Amendment recognizes temporary zones of privacy that are protected from warrantless intrusion, the defendant was not entitled to its protection in this case.

**AFFIRMED.**