UNITED STATES of America,
Plaintiff,

v.

Fernando GONZALES–BARRERA
(01) Defendant

No. CR–02–0900–PHX–JAT.

United States District Court,
D. Arizona.

Oct. 20, 2003.

Karen M Wilkinson, Federal Public Defender's Office, Phoenix, AZ, Eugene Marquez, Eugene Marquez PC, Tempe, AZ, for Fernando Gonzales-Barrera.

## ORDER

TEILBORG, District Judge.

Pending before this Court is Defendant Jose Luis Olivas–Sanchez's Motion to Suppress (Doc. # 28) and Supplemental Motion to Suppress (Doc. # 40) (collectively, the "Suppression Motions"). Defendant Jose Luis Olivas–Sanchez pled guilty and is no longer urging the Suppression Motions. Defendant Fernando Gonzales–Barrera ("Defendant"), however, joined (Docs. # 34 and # 42) and continues to urge the Suppression Motions.

The Government filed a Response to Defendant's Motion to Suppress and Supplemental Motion to Suppress (Doc. # 49).

In the Suppression Motions, Defendant seeks to suppress certain evidence ob-

tained during an August 2, 2002, warrantless search of a house located at 3137 West Roma Avenue, Phoenix, Arizona. (Doc. # 28 at 1; Doc. # 40 at 1.) Defendant seeks suppression on the following grounds: (1) the warrantless entry of the house was not justified by exigent circumstances (Doc. # 28 at 3); (2) there was no probable cause to enter or search the house (Doc. # 40 at 3); and (3) there was no probable cause to justify the search and seizure of personal property inside of the house because the incriminating nature of the personal property was not immediately apparent (Doc. # 28 at 4). The Government responds that Defendant does not have standing to challenge the entry and search of the house and that exigent circumstances justified the initial entry and search. (Doc. # 49 at 4–6.)

## I. FINDINGS

On October 8, 2003, this Court conducted an evidentiary hearing on the Suppression Motions. At the hearing, Defendant testified on his own behalf and Officer Jerry Hester, Officer Rudy Dominguez, and Agent Angel Rascon testified on behalf of the Government. Other than his testimony, Defendant did not introduce other evidence at the hearing.

Defendant testified that he had slept in the house at 3137 West Roma Avenue every night for at least one month. He further stated that he did not have any possessions in the home except for the clothes he was wearing at the time of his arrest. Defendant acknowledged that he was not paying rent, that people came and went at all times in the house, and that he had no privacy in the house. Importantly, Defendant admitted that he did not know who owned the house and that no one ever gave him permission to stay in the house.

Officer Hester testified that he was on patrol on the night of August 1, 2002, when he was approached by an unnamed individual.[1] The individual told Officer Hester that a friend was a "pollo" who had just escaped after being held at gunpoint by "coyotes" at a nearby house.[2] The individual also told Officer Hester that the coyotes were holding a large number of pollos. Although the individual was not able to provide an exact address for the house, he provided Officer Hester with the general location, including a nearby cross street and description of the house.

According to Officer Hester's testimony, he contacted other members of the Phoenix Police Department and they convened in a nearby parking lot to decide how to proceed. After a short discussion, Officer Hester got in the unnamed individual's car and rode to the house said to be occupied by the coyotes and pollos. Officer Hester noted the exact address of the house and observed that the individual's earlier description matched up with the house's actual appearance and location. Officer Hester and the individual then returned to the place where the other Phoenix police officers had gathered and Officer Hester advised the other officers that he had located the house and confirmed that it matched the description provided by the individual. Officer Hester also testified that the unnamed individual appeared sincere and trustworthy during the encounter.

The police officers, numbering between 20 and 25 officers, split into groups and approached the house in question. Officer Hester was in a group that approached the

---

1. Officer Hester did not recall the individual's name, but stated that he must have known it at the time because he remembered running a check to determine whether the individual had any outstanding warrants.

2. The terms "pollo" and "coyote" are commonly used to refer to illegal aliens and those who smuggle such aliens into the United States, respectively.

east side of the house. As he drew close to the house, Officer Hester was able to peer through a side window and see roughly 15 people lying down inside a single room of the house. Based on his experience, Officer Hester believed that the individuals were illegal aliens. Officer Hester then advised the other police officers about what he saw.

At around 10:00 p.m., Officer Dominguez approached the front door of the house and knocked. Someone inside of the house opened the door slightly and Officer Dominguez announced in English and in Spanish that he was with the Police Department. The front door slammed shut and Officer Dominguez testified that he heard voices from within and what sounded like people running inside of the house. The front door had a small window through which Officer Dominguez was able to see inside of the house. Through that window, Officer Dominguez saw two Hispanic males run toward the back of the house. Officer Dominguez also testified that, because the police officers had been advised that the coyotes were armed, he was concerned about his safety and the safety of the police officers approaching the house.

Officer Dominguez then forced the door open and entered the house. Officer Dominguez did not give chase to the Hispanic males that he saw fleeing toward the back of the house but, instead, secured the house and the individuals who were detained within the house. He also observed the butt end of a semi-automatic rifle sticking up from the couch and another rifle in the corner of the front room of the house.

The police officers then secured the house and escorted approximately 50 pollos out of the house. Just after midnight, agents from the Immigration and Naturalization Service ("INS") arrived. Agent Rascon testified that, upon his arrival, he and two other agents entered the house and seized a number of items that were lying around the house in plain view. These items included miscellaneous documents and bills, cell phones and cell phone chargers, spiral notebooks containing hand written notes, photographs, letters, a bus schedule, and a Sony tape labeled "Erica."

On cross-examination, Agent Rascon testified that the ring-leader of the coyotes likely had authority to use the house and to give permission to others to stay in the residence. Agent Rascon also stated that it "appeared" that Defendant had a right to be in the house and that Defendant roamed the house at will. Agent Rascon did not, however, testify that anyone had actually authorized Defendant to stay in the house.

Counsel for Defendant cross-examined all three of the Government's witnesses about the details of their direct testimony. Counsel for the Government cross-examined Defendant. The Court found Officers Hester and Dominguez, and Agent Rascon to be extremely credible witnesses.

## II. DISCUSSION

The Suppression Motions will be denied because: (1) Defendant has not sustained his burden of showing that he had a legitimate expectation of privacy in the house at 3137 West Roma Avenue; and (2) the Government has demonstrated that exigent circumstances justified the initial entry and sweep of the house. The Court also concludes that, even if Defendant continued to have a legitimate expectation of privacy in the house, the firearms seized inside the house should not be suppressed because their seizure was justified by probable cause.

■ **A. *Classification of Government's Conduct:*** "The threshold inquiry in any Fourth Amendment analysis is whether the government's conduct is included in the Amendment's coverage, in

other words, whether it amounts to a 'search' for constitutional purposes." *United States v. Gonzalez*, 328 F.3d 543, 546 (9th Cir.2003); *but see Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (resolving issues about whether defendant could assert Fourth Amendment protections without deciding whether search occurred). The Court must, therefore, consider the following governmental actions to determine whether each action implicated the Fourth Amendment: (1) approaching the house, observing the pollos through the bedroom window, and knocking on the front door of the house; (2) entering the house and conducting a protective sweep following that entry; (3) seizing the firearms; and (4) examining and seizing other items of personal property that were observed in the house.

■ (1) *Approaching the house, looking through the window, and knocking:* When Officer Dominguez approached the front door of the house he did not conduct a search. *See United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir.) ("Law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants . . . ."), *cert. denied*, 534 U.S. 866, 122 S.Ct. 152, 151 L.Ed.2d 102 (2001). Officer Hester did not conduct a search by approaching the front northeast corner of the house. *See id.* at 1060 (holding that officers did not conduct a search when they circled the house "with the intent of locating another door and for officer safety reasons" (internal quotation marks omitted)).

No search occurred when Officer Hester looked into the front bedroom window or when Officer Dominguez knocked and looked through the front door window. *See United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir.1993) ("We have held that officers walking up to the front door of a house can look inside though a partial-ly draped open window without conducting a Fourth Amendment search."); *see also Hammett*, 236 F.3d at 1060–61 (stating that marijuana plants viewed through crack in wall are in "plain view").

■ "[A]nyone may 'openly and peaceably knock [on an individual's door] with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.'" *Hammett*, 236 F.3d at 1059 (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964)). Accordingly, Officer Dominguez did not conduct a "search" by knocking on the front door of the house and identifying himself when the door was opened.

■ (2) *Entering the house and conducting protective sweep:* When police enter a house, even to secure it, they have conducted a seizure subject to the Fourth Amendment. *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir.1989). Thus, despite his concerns about the safety of individuals within the house, Officer Dominguez conducted a seizure for purposes of the Fourth Amendment by forcing his way into the house.

Similarly, regardless of their intentions, the officers' subsequent sweep of the house to ensure the safety of the officers and the inhabitants of the house constitutes a search for purposes of the Fourth Amendment. *See Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (even where initial entry is justified, Fourth Amendment is implicated by continued search activities). However, the officers did not conduct separate Fourth Amendment searches by merely observing people and objects that were in plain view during their sweep of the house. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

 **(3 and 4)** *Examining and seizing the firearms and other items inside of the house:* When police officers are constitutionally entitled to be in a place, the seizure of items in plain view implicates the Fourth Amendment. *See Arizona v. Hicks,* 480 U.S. 321, 326–27, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (search and seizure of items in plain view must be supported by probable cause). The same is true for any type of search for which the evidentiary value of the item searched is not facially evident. *Id.* Accordingly, when Officer Dominguez seized the rifles and, later, when Agents Rascon examined and then seized the cell phones, notebooks and other items, their actions implicated the Fourth Amendment.

As discussed above, some of the Government's actions can be characterized as searches or seizures subject to the Fourth Amendment, while other actions do not implicate the Fourth Amendment. Specifically, as Defendant conceded at oral argument, no Fourth Amendment issues are raised until Officer Dominguez entered the house. The acts leading up to that event—the approach to the house, observing individuals through the bedroom window, knocking on the door, and listening to sounds coming from within—were not "searches" subject to the Fourth Amendment. The entry of the house, and the subsequent acts described above, implicate the Fourth Amendment and must be reviewed by this Court.

██ **B.** *Legitimate Expectations of Privacy:* Before determining whether the officers' and agents' actions violated the Fourth Amendment, this Court must determine whether Defendant can assert the protections of the Fourth Amendment against the challenged actions.

██ Although the term "standing" is commonly used to connote whether a defendant can assert Fourth Amendment rights, the Supreme Court has indicated that "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Carter,* 525 U.S. at 88, 119 S.Ct. 469 (internal quotation marks omitted). Thus, whether a person can avail himself of "the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* (internal quotation marks omitted); *see also Gonzalez,* 328 F.3d at 547.

 The Defendant bears the burden of proving that he had a legitimate expectation of privacy. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Silva,* 247 F.3d 1051, 1055 (9th Cir.2001). Some occupants may have a legitimate expectation of privacy in a house while others will not. "Thus, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Carter,* 525 U.S. at 90, 119 S.Ct. 469; *see also Nadell v. Las Vegas Met. Police Dept.,* 268 F.3d 924, 928 (9th Cir.2001) (finding no expectation of privacy when defendant "was not an overnight guest but, rather, that she was merely present with the consent of the householder and had formed no intention to remain overnight ..."), *cert. denied,* 535 U.S. 1057, 122 S.Ct. 1917, 152 L.Ed.2d 826 (2002). Moreover, property "used for commercial purposes is treated differently for Fourth Amendment purposes than residential property." *Carter,* 525 U.S. at 90, 119 S.Ct. 469. Whether a legitimate expectation of privacy exists may then depend on a defendant's status in the home,

the length of time for which a defendant is present in a house, and the use to which the house is put. *Id.*

In *Minnesota v. Carter*, individuals in a house were engaged in the task of bagging cocaine. The Supreme Court held that those individuals did not have a legitimate expectation of privacy in the home because the defendants "were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours." *Id.*

In its pleadings and during the evidentiary hearing, the Government asserted that Defendant did not have an expectation of privacy in the house because Defendant was using the house for the ostensible business purpose of holding hostages. Hostage holding for ransom certainly qualifies as a business transaction, albeit an illegitimate one, in much the same way as cocaine bagging was a business transaction in *Minnesota v. Carter*. That the house was used for a business purpose does not end the inquiry—Defendant could still have a legitimate expectation of privacy as an invited overnight guest. *Id.* However, the Defendant must produce proof to corroborate his assertion that he was an overnight guest. *United States v. Armenta*, 69 F.3d 304, 308 (9th Cir.1995) ("Armenta's bald assertion that he was an overnight guest ... is not sufficient to establish that he had a legitimate expectation or privacy in the house.").

In support of his assertion of a legitimate expectation of privacy, Defendant relies on *United States v. Gamez–Orduno*, 235 F.3d 453 (9th Cir.2000). In *Gamez–Orduno*, the court found that defendants had a legitimate expectation of privacy as overnight guests in a trailer where " 'each of [the appellants] were backpackers *staying at the residence for food and rest'* with *the permission of at least Oscar Carrillo [the trailer owner's son] and possibly Mary Ann [the owner] as well.*" *Id.* at

459 (quoting the lower court order; italicized emphasis in original; underlined emphasis added). The lower court had found the defendants were overnight guests, but that they had no expectation of privacy because of the commercial nature of their visit—*i.e.*, drug smuggling activities. *Id.* The Court of Appeals rejected the lower court decision because the commercial nature of the visit did not trump the fact that the defendants were overnight guests:

> Indeed, there is no reason why the nature of the relationship between host and guest should affect the overnight guest's expectation of privacy. A businessman who stays at the home of a business acquaintance when he comes to town for no other purpose than to conclude a deal is still an overnight guest, not engaged in "purely commercial" commercial activity while at the home, and has an expectation of privacy while there.

*Id.* at 460.

Although Defendant is correct that the distinction between commercial and non-commercial activities is not dispositive in this case, Defendant's reliance on *Gamez–Orduno* is still misplaced. Defendant focuses on the "overnight" portion of the *Gamez–Orduno* analysis, but ignores the word "guest." The Supreme Court has long distinguished between "guests" and others who are simply legitimately present at the time of the search:

> Nonetheless, we believe that the phrase "legitimately on premises" ... creates too broad a gauge for measurement of Fourth Amendment rights. For example, applied literally, this statement would permit a casual visitor who has never seen, or been permitted to visit, the basement of another's house to object to a search of the basement if the visitor happened to be in the kitchen of the house at the time of the search.

Likewise, a casual visitor who walks into a house one minute before a search of the house commences and leaves one minute after the search ends would be able to contest the legality of the search. The first visitor would have absolutely no interest or legitimate expectation of privacy in the basement, the second would have none in the house, and it advances no purpose served by the Fourth Amendment to permit either of them to object to the lawfulness of the search.

*Rakas v. Illinois,* 439 U.S. 128, 142, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (footnotes omitted).

■ Moreover, an "overnight guest" is more than someone who simply spends the night. Such status is contingent on an invitation by an authorized host:

> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest.

*Minnesota v. Olson,* 495 U.S. 91, 99, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *see also Armenta,* 69 F.3d at 309 ("At most, the evidence suggests that [the defendant] was 'legitimately on the premises,' which is insufficient to demonstrate a legitimate expectation of privacy.") (quoting *Olson,* 495 U.S. at 97, 110 S.Ct. 1684).

Both defendants in *Gamez–Orduno* were present in the trailer overnight with the permission of a host. 235 F.3d at 459.

Thus, even if Defendant's assertion that he had spent many nights at the house is true, Defendant's concession that no one had given him permission to stay in the house is an important factor that takes this case outside the ambit of *Gamez–Orduno.* Absent a showing that he was an invited guest, Defendant has not borne his burden of proving that he had a legitimate expectation of privacy in the house.

Defendant did not produce evidence to corroborate his claim of a legitimate expectation of privacy in the house. *See Carter,* 525 U.S. at 88, 119 S.Ct. 469; *Armenta,* 69 F.3d at 308. Moreover, Defendant expressly denied that he had been given permission by any identifiable host to stay in the house, effectively denying any legitimate expectation of privacy as an overnight guest. *See Silva,* 247 F.3d at 1056 ("Defendants' bald assertions . . . that they had a reasonable expectation or privacy and that they had stayed in the shed during the previous night . . . are not sufficient to establish that they were in fact overnight guests of an identifiable host, or that their expectation of privacy was otherwise legitimate."). Accordingly, the Court finds that Defendant cannot claim Fourth Amendment protections as to the entries of the house, the subsequent sweep and search of the house, or the accompanying seizure of evidence taken from the house. Accordingly, the Court will deny Defendant's Suppression Motions.

C. *Exceptions to the warrant requirement:* In the alternative, even if Defendant had a legitimate expectation of privacy in the house, the Court will deny the Suppression Motions as applied to the initial entry and subsequent protective sweep of the house by Phoenix police officers, because the entry and sweep were justified by exceptions to the warrant requirement:

**(1) Exigent Circumstances:** The Government argues that the officers' entry into the house was justified by exigent circumstances. Defendant argues that exigent circumstances do not justify the entry because the officers could have obtained a warrant.

 In the usual case, a warrantless entry of a private residence is presumptively unreasonable. *Murdock v. Stout,* 54 F.3d 1437, 1440 (9th Cir.1995). "The presumption of unreasonableness can be overcome, however, when the police confront an exigent circumstance like a fleeing felon. In these situations, the exigent circumstance relieves the police of the obligation of obtaining a warrant." *United States v. Johnson,* 256 F.3d 895, 905 (9th Cir.2001) (*en banc*) (internal citation omitted).

 "Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search [or arrest] until a warrant could be obtained." *United States v. Gooch,* 6 F.3d 673, 679 (9th Cir. 1993) (internal citation and quotation marks omitted; brackets in original). "Exigent circumstances are present when a reasonable person [would] believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Alaimalo,* 313 F.3d 1188, 1192–93 (9th Cir. 2002) (citation and quotation omitted; alterations in original), *cert. denied,* —— U.S. ——, 124 S.Ct. 242, 157 L.Ed.2d 172 (2003); *see also United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.1984) (*en banc*).

 "Even when exigent circumstances exist, police officers must have probable cause to support a warrantless entry into a home. Probable cause requires only a fair probability or substantial chance of criminal activity, and we determine the existence of probable cause by looking at 'the totality of the circumstances known to the officers at the time.'" *Alaimalo,* 313 F.3d at 1193 (internal citation omitted; quoting *United States v. Bishop,* 264 F.3d 919, 924 (9th Cir.2001)). Thus, in order to rely on exigent circumstances to justify the entry and initial sweep of the house, the Government "must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *Johnson,* 256 F.3d at 905.

 **a. Probable cause to search the house:** At the time that Officer Dominguez entered the house, there was probable cause for the entry. The "totality of the circumstances known to the officers at the time"—the initial tip, the confirmation of that tip when Officer Hester confirmed the appearance and location of the house and when he saw approximately 20 individuals huddled in the bedroom, the partial opening and abrupt slamming of the door, and the sounds coming from within the house—are sufficient to provide probable cause to search the house. Defendant repeatedly criticized the tip as "anonymous," but anonymous tips, when corroborated, are sufficient to establish probable cause. *See Illinois v. Gates,* 462 U.S. 213, 243–44, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (finding probable cause based on anonymous tip and corroboration of parts of that tip); *Bishop,* 264 F.3d at 925–26 (probable cause based on tip that was partially corroborated by confirming that suspect had access to a storage shed identified in tip); *also cf. Alaimalo,* 313 F.3d at 1193 (finding probable cause that drug package was

in house based on the "circuitous route" taken in driving to the house and officer knowledge that drug traffickers generally do not leave drug packages unattended in car); *United States v. Duran–Orozco*, 192 F.3d 1277, 1281 (9th Cir.1999) (finding that probable cause existed based on information that eight individuals were carrying bundles from the border, along with observation of evidence of efforts to conceal a trail—a broom, erased footprints, and imprints from burlap bags). Thus, the first prong of the exigent circumstances is satisfied because Officer Dominguez had probable cause to enter the house.

**■ b. Exigent circumstances to justify the entry:** Similarly, the government has amply demonstrated that there were exigent circumstances sufficient to justify the intrusion. Defendant argues that the availability of telephonic warrants at all hours obviated the argument that the warrantless entry was necessary. Defendant's argument fails, however, because there was no time period between Officer Dominguez's knock and the exigent circumstance during which a warrant could have been obtained. Once the exigent circumstances arose, stopping to obtain a warrant would have frustrated law enforcement objectives and possibly placed lives in danger.[3]

The Government has amply proved that the circumstances justified the entry. Specifically, evidence showed that (i) the officers had a partially corroborated tip that illegal aliens were being held hostage at gunpoint, (ii) Officer Hester saw individuals who appeared to be in a hostage-type situation, (iii) an occupant of the house slammed the door when he realized that police officers were at the front door, and

(iv) Officer Dominguez heard noises emanating from the house that gave him concern about fleeing suspects and the safety of officers surrounding the house. Based on that evidence, a reasonable person would believe that entering the house "was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Alaimalo*, 313 F.3d at 1192–93; *see also Illinois v. McArthur*, 531 U.S. 326, 332, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (finding exigent circumstances where police had "good reason" to fear that evidence would be destroyed); *Ortiz–Sandoval v. Clarke*, 323 F.3d 1165, 1172 (9th Cir.2003) (finding strong argument for exigent circumstances where police had reason to believe that defendant was armed with an unaccounted for murder weapon); *also cf. United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir.2000) (finding emergency doctrine justified entry without probable cause where police believe there is a need to protect life or property, and the police are not primarily motivated by intent to arrest and search).

Accordingly, the Court finds that the government has satisfied the two requirements of *United States v. Johnson*, and has shown that the initial entry into the house was justified by probable cause and exigent circumstances.

**■ (2) *Protective Sweep:*** Even after Officer Dominguez's justified entry into the house, the officers' actions continue to be subject to the Fourth Amendment. *See Mincey*, 437 U.S. at 393, 98 S.Ct. 2408

---

**3.** It is worth noting that the exigent circumstances and probable cause occurred nearly simultaneously. In other words, the police officers likely did not have probable cause to seek a warrant until Officer Hester corrobo- rated the tip by observing through the side window the individuals gathered in the room. Officer Dominguez's knock on the front door, almost immediately thereafter, gave rise to the exigent circumstances.

(even where initial entry is justified, Fourth Amendment is implicated by continued search activities). The initial seizure of the rifles, however, is proper because objects observed in plain view can be properly seized under the Fourth Amendment without a warrant. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant . . . . When the initial intrusion that brings police within plain view of [evidence] is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirements, the seizure is also legitimate." *Coolidge,* 403 U.S. at 465, 91 S.Ct. 2022.

■ Moreover, after the officers saw the rifles in the house, they were justified in conducting a protective sweep of the entire house to ensure the safety of the officers and other individuals present in and around the house. *See United States v. Meza–Corrales,* 183 F.3d 1116, 1124 (9th Cir.1999) (finding that protective sweep was justified when officers had reason to fear that "other persons might be running around inside the residence, carrying loaded handguns similar to those found . . ."); *United States v. Gardner,* 627 F.2d 906, 910 (9th Cir.1980) (applying protective sweep exception where the agent "had seen weapons in the initial search of the premises and it was therefore both reasonable and prudent for him to conclude that the potential for violence was present . . .").

Any evidence of a crime found in plain view during the protective sweep of the house can be seized, provided that the officers had probable cause to believe that the item is evidence of a crime. *Hicks,* 480 U.S. at 326–28, 107 S.Ct. 1149; *Gardner,* 627 F.2d at 910. Thus, the Fourth Amendment was not violated when officers seized the rifles.

■ **D.** *Search and Seizure of Cell Phones and Notebooks:* Defendant separately objects to the admission of the other items seized by Agent Rascon on the grounds that the subsequent entry and search of the house by INS agents was no longer justified by exigent circumstances. In many respects, Defendant's argument is compelling,[4] but because Defendant did not have a legitimate expectation of privacy in the house or its contents it is not necessary for the Court will resolve these issues. Instead, for purposes of the cell phones, notebooks and other items seized by Agent Rascon, the Court relies solely on the grounds that Defendant did not have a legitimate expectation of privacy in the house or its contents.[5]

## III. CONCLUSION

Defendant has not demonstrated evidence to show that he had a legitimate expectation of privacy in the house. Moreover, even if the Defendant had a legitimate expectation of privacy in the house, the government has introduced sufficient evidence to show exigent circumstances

4. For example, it is not clear that the exigent circumstances that justified the initial entry by Phoenix police officers would serve to justify the subsequent entry by the INS. *But see Ortiz–Sandoval,* 323 F.3d at 1170 ("On the one hand, exigent circumstances may exist in spite of such a [40 minute] delay. . . . Even in the absence of hot pursuit, the gravity of the crime and likelihood that the suspect is armed may be considered when weighing the risk of danger."). Similarly, because the incriminating nature of these items is not facially evi-

dent, the notebooks and cellular telephones that were examined and seized by the INS agents present a much closer question than the rifles.

5. At the evidentiary hearing, the Government effectively abandoned the abandonment argument that it had advanced in its written pleadings. Because the Government no longer urges that argument, the Court will not address it now.

justifying the entry and initial search of the house. Therefore, based on the evidence introduced at the evidentiary hearing and the foregoing analysis, this Court hereby denies the Suppression Motions.

Accordingly,

**IT IS ORDERED** that the Motion to Suppress (Doc. # 28) and Supplemental Motion to Suppress (Doc. # 40), as joined by Defendant Fernando Gonzales–Barrera through the Notices of Joinder (Docs. # 34 and # 42), are denied.