119 P.3d 865 (2005)
CENTIMARK CORPORATION, Appellant,
v.
DEPARTMENT OF LABOR AND INDUSTRIES OF WASHINGTON, Respondent.
No. 54936-7-I.
Court of Appeals of Washington, Division 1.
August 15, 2005.
Publication Ordered September 12, 2005.
*866 Aaron Kazuo Owada, Northcraft, Bigby & Owada, PC, Seattle, WA, for Appellant.
Beth Anne Bielefield, Atty Generals Office/Labor & Ind. Div., Olympia, WA, for Respondent.

PUBLISHED IN PART
AGID, J.
¶ 1 The Department of Labor and Industries (L & I) issued Centimark, a nationwide roofing company, a citation for several violations of WAC safety regulations, including two serious, repeat violations, after a Washington Industrial Safety & Health Act (WISHA) safety officer observed Centimark employees working without proper fall protection on the roof of Everett Pad & Paper (EPP). The officer accessed the worksite and performed his safety inspection without a warrant. The Board of Industrial Insurance Appeals (BIIA) affirmed L & I's citation, and Centimark appeals.
¶ 2 We conclude that Centimark did not have a reasonable expectation of privacy in its worksite on EPP's roof, so L & I did not conduct an unconstitutional search. In addition, there was a substantial probability that an injury resulting from the violation would cause death or serious injury. Because L & I had cited Centimark for a similar violation the previous year and Centimark should have known of the current violative condition, BIIA did not err in classifying the violations as "serious" and "repeat." Further, substantial evidence supports BIIA's finding that Centimark failed to prove unpreventable employee misconduct. We affirm.

FACTS
¶ 3 On June 9, 2000, L & I received an anonymous phone call informing them that someone was working without fall protection on the roof of EPP. WISHA Safety Compliance Officer Cameron Fischer drove to EPP to investigate. As Fischer pulled up, he observed three rooftop workers who did not appear to be using any fall protection.[1] After Fischer got out of his car, he took one photograph of the general site and another as he walked toward the building. The second photo shows a warning line system running *867 along the front of the roof, but not along the sides. Fischer then climbed an extension ladder that was leaning against the building and stepped onto the roof. He then took a third photograph that showed one worker, Jason Thao, immediately adjacent to a roof edge that did not have a warning line. Thao was holding one end of a chalk line while the foreman, Nunn Pathammavong, held the other end toward the middle of the roof. Until he was on the roof, Fischer did not see any of the workers within six feet of the edge and could not tell what they were doing.[2]
¶ 4 After taking the third picture, Fischer identified himself and said he was there to perform a safety inspection. He talked to Pathammavong and learned that Centimark employed the workers. Fischer told Pathammavong that he could call Centimark's office if he wanted to let someone else know what was happening. Pathammavong contacted Greg O'Neil, Centimark's Operations Manager, who arrived on site while Fischer was still inspecting the jobsite. From his observations on the roof and his discussions with Pathammavong, Fischer learned that the workers were not using fall restraint or fall arrest systems, and that they were incorrectly using a warning line and safety monitor system. The warning lines did not extend to the sides of the roof and the safety monitor, Pathammavong, was not wearing distinctive clothing and was doing things other than being the safety monitor.[3] Fischer asked to see the fall protection plan for the site, but neither the workers nor O'Neil could find it.[4] Fischer also noticed that Centimark had not appropriately marked the roof access path and was storing work material within six feet of the roof edge. At the end of his inspection, Fischer had closing conferences with both Pathammavong and O'Neil.
¶ 5 L & I cited Centimark for five WAC safety regulation violations: Item 1-1(a) for a repeat, serious violation of WAC 296-155-24515(1) for failing to ensure fall protection for workers on a roof with a fall protection hazard greater than 10 feet; Item 1-1(b) for a repeat, serious violation of WAC 296-155-24505(1) for failing to implement a written fall protection plan; Item 2-1 for a general violation of WAC 296-155-24515(3) for failing to ensure the warning line system was erected around all sides of the work area; Item 2-2 for a general violation of WAC 296-155-24515(3)(c)(I) for failing to ensure a clear roof access path with two warning lines from the ladder to the work area; and Item 2-3 for a general violation of WAC 296-155-24515(4)(f) for failing to ensure that materials were not stored within six feet of the roof edge. The proposed penalty for the Item 1 violations was $1,280.00, with no proposed penalty for the general violations in Item 2.
¶ 6 After Centimark appealed the citation, L & I issued a Corrective Notice of Redetermination (CNR) on August 24, 2000, affirming the citation and associated penalty. Centimark appealed to the Board of Industrial Insurance Appeals (BIIA), arguing that L & I's evidence was the fruit of an unconstitutional search and that the evidence and law did not support a citation for the violations. On September 25, 2001, an Industrial Appeals Judge issued a Proposed Decision and Order (PDO) affirming the CNR. On November 30, 2001, BIIA denied Centimark's petition for further review, and the PDO became BIIA's final order. Centimark sought review in Snohomish County Superior Court, and on August 12, 2004, the court affirmed BIIA's order, adopting BIIA's findings of fact and conclusions of law by reference.

*868 DISCUSSION
¶ 7 Centimark argues that Fischer's warrantless inspection of the worksite violated its constitutional privacy rights. We review constitutional issues de novo.[5] Centimark also asserts that BIIA erred in ruling that Centimark's WISHA violations were serious, repeat violations and that it did not prove unpreventable employee misconduct. We sit in the same position as the superior court in reviewing BIIA's decision.[6]

I. Unconstitutional Search

¶ 8 Centimark argues that BIIA erred in not suppressing L & I's evidence because Fischer observed the violations after he came on the worksite without a warrant, thereby violating Centimark's right of privacy. L & I argues that Centimark had no reasonable expectation of privacy in the rooftop worksite. The Fourth Amendment protects people from unreasonable searches and seizures.[7] Article 1, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The exclusionary rule requires suppression of evidence obtained as the result of an unconstitutional search.[8]
¶ 9 A. Gunwall Analysis
¶ 10 As an initial matter, Centimark argues that article I, section 7 of the Washington Constitution provides greater protection than the Fourth Amendment. A party asserting that a state constitutional provision is more protective than its federal counterpart must analyze the six Gunwall factors: "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern."[9]
Once this court has conducted a Gunwall-type analysis and has determined that a provision of the state constitution independently applies to a specific legal issue, in subsequent cases it is unnecessary to repeat the Gunwall-type analysis of the same legal issue. It is already well established that article I, section 7, of the state constitution has broader application than does the Fourth Amendment of the United States Constitution. . . .[10]
Because article I, section 7 provides qualitatively different and sometimes greater protection, "the focus of a challenge under this section is on whether the language of the state constitutional provision and its prior interpretations actually compel a particular result."[11] In the context of an article I, section 7 challenge, analysis of the first, second, third, and fifth factors will not vary from case to case,[12] so Centimark needed only to analyze Gunwall factors four and six. Centimark does not address either of these factors and cites no prior interpretations of article I, section 7 which would compel greater protection in the context of a WISHA inspection. In the absence of a Gunwall analysis for a specific legal issue, we cannot consider an argument that the Washington Constitution provides greater protection than its federal counterpart.[13] Thus we interpret article I, section 7 coextensively with the Fourth Amendment in the context of a WISHA inspection.[14]

*869 B. Reasonable Expectation of Privacy

¶ 11 L & I argues that it did not need a warrant because Centimark's purpose for being on EPP's roof was purely commercial and thus Centimark did not have a reasonable expectation of privacy in the worksite. Centimark argues that a warrant is required to inspect private commercial property. The constitutional right to privacy does not apply to areas in which there is no reasonable expectation of privacy.[15]
¶ 12 Whether government conduct amounts to a search for constitutional purposes depends on whether the government "`violates a subjective expectation of privacy that society recognizes as reasonable.'"[16] Protection "against unreasonable searches and seizures extends to commercial property,"[17] but "that protection must be premised on a `reasonable expectation of privacy.'"[18] "An owner or operator of a business . . . has an expectation of privacy in commercial property[] which society is prepared to consider to be reasonable," including for purposes of administrative inspections designed to enforce regulations.[19] But an expectation of privacy in commercial premises is different, and less significant, than a "similar expectation in an individual's home."[20] "`[A]n individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location.'"[21] A worker can sometimes claim Fourth Amendment protection over his own workplace.[22]
¶ 13 Although Minnesota v. Carter involved a person's expectation of privacy in another's home, the Supreme Court's analysis provides guidance here.[23] There, the respondents were observed in another person's apartment bagging cocaine. They were only in the apartment for two and one-half hours, and only to bag cocaine. The Court held they had no legitimate expectation of privacy in the apartment:
If we regard the overnight guest . . . as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. . . .[24]
¶ 14 Here, while Centimark is correct that warrants are normally required to "enter upon and inspect commercial premises,"[25] *870 Fischer needed a warrant only if Centimark had a reasonable expectation of privacy in EPP's roof. If a person who is on someone else's residential property for a purely commercial purpose would not have a legitimate privacy interest,[26] it follows that a contractor under the same circumstances on someone else's commercial property would also not have a legitimate privacy interest. As in Minnesota v. Carter, if the owner or operator on his own commercial property typifies one who may claim Fourth Amendment protection, and if one who is briefly on another's commercial premises simply to conduct a business transaction typifies those who may not do so, the facts in this case fall much closer to the latter. Centimark was not on its own commercial property and was on EPP's commercial property for only a few days for purely commercial purposes. It therefore did not have an expectation of privacy that society would recognize as reasonable. L & I did not violate Centimark's constitutional rights, and BIIA did not err by denying Centimark's motion to suppress evidence.
The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. See RCW 2.06.040; CAR 14.
WE CONCUR: BAKER and COLEMAN, JJ.
NOTES
[1] Workers on low-pitched roofs with a fall hazard greater than 10 feet must use a fall restraint or fall arrest system, or a warning line and safety monitor system. WAC 296-155-24515(1)(a)-(b).
[2] Fischer testified that he did not enter the EPP building or attempt to introduce himself to anyone before he climbed the ladder because he had already observed what appeared to be serious worksite violations and believed he had the right to initiate an inspection.
[3] "Employees engaged in roofing on low-pitched roofs less than 50 feet wide, may elect to use a safety monitor system without warning lines." WAC 296-155-24515(2)(b). But the safety monitor must, among other things, be "instantly distinguishable over members of the work crew," and "[e]ngage in no other duties while acting as safety monitor." WAC 296-155-24521(4)(c)-(d).
[4] "The employer shall develop and implement a written fall protection work plan including each area of the work place where the employees are assigned and where fall hazards of 10 feet or more exist." WAC 296-155-24505(1). O'Neil faxed Fischer a copy of the plan later that day. It identified fall arrest as the fall protection system to be used at the EPP site, not the safety monitor system that was actually being used when Fischer arrived.
[5] Shoop v. Kittitas County, 149 Wash.2d 29, 33, 65 P.3d 1194 (2003).
[6] Farm Supply Distribs., Inc. v. Wash. Utils. & Transp. Comm'n, 83 Wash.2d 446, 448, 518 P.2d 1237 (1974).
[7] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV.
[8] State v. Boland, 115 Wash.2d 571, 582-83, 800 P.2d 1112 (1990).
[9] State v. Gunwall, 106 Wash.2d 54, 58, 720 P.2d 808 (1986).
[10] State v. Ladson, 138 Wash.2d 343, 348, 979 P.2d 833 (1999) (citations omitted).
[11] State v. McKinney, 148 Wash.2d 20, 26, 60 P.3d 46 (2002) (citing City of Seattle v. McCready, 123 Wash.2d 260, 267, 868 P.2d 134 (1994)).
[12] Boland, 115 Wash.2d at 576, 800 P.2d 1112.
[13] In re Dyer, 143 Wash.2d 384, 394, 20 P.3d 907 (2001) (citing State v. Lee, 135 Wash.2d 369, 387, 957 P.2d 741 (1998)).
[14] Washington courts "`will interpret the Washington constitution coextensively with its parallel federal counterpart.'" Id. (quoting Lee, 135 Wash.2d at 387, 957 P.2d 741).
[15] State v. Hastings, 57 Wash.App. 836, 839, 790 P.2d 645 (1990) (citing Lewis v. United States, 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966); State v. Drumhiller, 36 Wash.App. 592, 595, 675 P.2d 631, review denied, 101 Wash.2d 1012 (1984)), aff'd, 119 Wash.2d 229, 830 P.2d 658 (1992).
[16] United States v. Gonzalez, 328 F.3d 543, 546 (9th Cir.2003) (quoting Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)).
[17] L.R. Willson & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 134 F.3d 1235, 1238 (4th Cir.1998) (citing Marshall v. Barlow's, Inc., 436 U.S. 307, 311, 98 S.Ct. 1816, 1819-20, 56 L.Ed.2d 305 (1978)), cert. denied sub nom. Herman v. L.R. Willson & Sons, Inc., 525 U.S. 962, 119 S.Ct. 404, 142 L.Ed.2d 328 (1998).
[18] Id. (quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).
[19] New York v. Burger, 482 U.S. 691, 699-700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (emphasis added).
[20] Id. at 700, 107 S.Ct. 2636.
[21] Gonzalez, 328 F.3d at 547 (second alteration in original) (quoting United States v. Gamez-Orduno, 235 F.3d 453, 458 (9th Cir.2000)).
[22] Minnesota v. Carter, 525 U.S. 83, 90-91, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).
[23] 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).
[24] Id. at 91, 119 S.Ct. 469.
[25] See v. City of Seattle, 387 U.S. 541, 544, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). "We hold only that the basic component of a reasonable search under the Fourth Amendment  that it not be enforced without a suitable warrant procedure  is applicable in this context, as in others, to business as well as to residential premises." Id. at 546, 87 S.Ct. 1737.
[26] Gonzalez, 328 F.3d at 547.