NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

v.

ANDRIENE NATALIE WALTERS, *Appellant.*

No. 1 CA-CR 17-0253
FILED 7-10-2018

Appeal from the Superior Court in Maricopa County
No.  CR2012-147352-004
The Honorable John R. Ditsworth, Judge *Retired*
The Honorable Roland J. Steinle, Judge *Retired*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Barbara Hull Attorney at Law, Phoenix
By Barbara L. Hull
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Paul J. McMurdie joined.

---

**W E I N Z W E I G**, Judge:

¶1            Andriene Walters appeals her five felony convictions and sentences.  She argues the State violated her Fourth Amendment rights.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2            This case is about a drug deal.  A confidential informant for the Maricopa County Sheriff's Office learned about the potential deal in September 2012.  The informant posed as a bulk marijuana seller.  A broker contacted him about an interested buyer who wanted to purchase 800 pounds of marijuana.  They met to discuss price; the informant gave the broker a marijuana sample.  The informant was wearing an audio monitoring device that allowed Detective Claudio Fausto to hear the informant's conversations.

¶3            The informant and broker met again the next day in South Phoenix.  The buyer wanted to see "the whole block of weed," which the informant had placed in the back seat of his car.  A "Jamaican guy" soon arrived, peered into the car, saw the block of marijuana and said, "let's make this happen."  The men then drove to a fast-food restaurant in West Phoenix, where they met a second broker and followed him to a nearby house in separate cars.

¶4            Detective Fausto continued to monitor the transaction.  A surveillance team was deployed around the house, including at least three officers who "had eyes on the front of the house" and more officers on the perimeter.

¶5            The informant entered through the garage and met a larger group in the kitchen, where they discussed the transaction.  Through the monitoring device, Detective Fausto heard "at least two males, or two Jamaican males, the brokers, and . . . a female."  Fausto heard the female well "because she got very close to the informant."  She asked the informant if he was a cop; the informant said no.  She said if he wasn't a cop, then they

would be in business. The informant asked to see the money. The woman boasted "that she was ready to purchase 6,000 pounds if she wanted to. She had the money for that, and then she told him that she was the queen of the Jamaicans." The informant saw the money, which was hidden inside the lining of multiple suitcases.

¶6        The informant agreed to retrieve the drugs, ostensibly stashed not far from the house. He returned to his car and drove off, followed by the second broker in another car. Police descended and stopped both cars, but not before the second broker called to warn the buyers at the house. At least three suspects fled the house "running [in] different directions," including two men and one woman. Police secured the residence and detained the suspects who remained in the house.

¶7        Meanwhile, the informant was "arrested," pulled aside and asked to describe the suspects. He described the woman who referred to herself as "the queen of the Jamaicans" as "wearing like a blue denim or Levi[']s type of a bottom and top." She had long curly hair and "a thick Jamaican accent." Detective Fausto broadcast the description to the surveillance team via radio.

¶8        Sergeant Gentry was on the surveillance team. As the deal unfolded, he was parked a street north of the house. He initially pursued the second broker's car, but returned toward the house to search for the fleeing suspects. He was driving slowly through the neighborhood when two men standing in a driveway said, "Your bitch is running . . . that way," signaling toward 91st Avenue. Sergeant Gentry continued in that direction and found a woman "matching the clothing description." It was Walters. She had not made it far, only a block north of the house. Nor had much time elapsed. She was found within 10 minutes after Sergeant Gentry heard the suspects had fled on foot.

¶9        Sergeant Gentry parked his patrol car, approached the woman and asked for identification. She pulled two ID cards from her purse. Neither belonged to her. She provided her name in "a very thick Jamaican accent." It did not match either ID card. Asked where she was headed, Walters said she was hemorrhaging and thus walking to the hospital. Sergeant Gentry saw nothing physically wrong with her. Gentry snapped a photograph of her with his cell phone, which was electronically sent to Detective Fausto and the informant. The informant confirmed it was "the lady that claimed she was the queen of the Jamaican [sic]." Sergeant Gentry arrested Walters.

¶10      Walters was charged with conspiracy to commit possession of marijuana for sale, a Class 2 felony ("Count 1"); possession of marijuana for sale, a Class 4 felony ("Count 2"); possession of drug paraphernalia, a Class 6 felony ("Count 3"); money laundering in the second degree, a Class 3 felony ("Count 4"); conspiracy to commit money laundering in the second degree, a Class 3 felony ("Count 5"); misconduct involving weapons, a Class 4 felony ("Count 6"); and misconduct involving weapons, a Class 4 felony ("Count 7").

¶11      Walters filed a pretrial "motion to dismiss for lack of reasonable suspicion," arguing that Sergeant Gentry violated her Fourth Amendment rights when he approached and photographed her on a public street. She asked the court to dismiss the charges or suppress all evidence "obtained after [she] was wrongfully seized." The superior court heard argument and held an evidentiary hearing before denying the motion.

¶12      After a hung jury, a second jury found Walters guilty of Counts 1, 3, 4, 5 and 7. Walters admitted her historical prior felony convictions and was sentenced to concurrent, mitigated terms, the longest of which is 11 years. Walters appealed. We have jurisdiction pursuant to Ariz. Const. art. VI, § 9, and A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033(A)(1).

## DISCUSSION

¶13      Walters argues that Sergeant Gentry violated her Fourth Amendment rights because he lacked reasonable suspicion to approach her on the street, lacked probable cause to take and share her photograph and lacked probable cause to arrest her based solely on the photograph. We disagree.

¶14      To begin, Walters seeks an improper and unavailable remedy. The standard remedy for an unlawful search and seizure in a criminal trial is to exclude the tainted evidence acquired by the illegal search. *See United States v. Morrison*, 449 U.S. 361, 366 (1981) ("The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression."). But Walters asks us to reverse her convictions and dismiss all charges under the Fourth Amendment. No such remedy is available. *Id.* ("[W]e have not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment.").

¶15      We review determinations of reasonable suspicion and probable cause *de novo*, but defer to the superior court's findings of fact. *State v. Fornof*, 218 Ariz. 74, 76, ¶ 5 (App. 2008) (reasonable suspicion); *State v. Blackmore*, 186 Ariz. 630, 632 (1996) (probable cause).

**¶16**        Walters never argued in her opening brief that the court erroneously admitted any evidence resulting from the stop, but in a single sentence in her reply brief, without citation, she posits that "all information obtained [after Sergeant Gentry told her to stop] is fruit of the poisonous tree and must be suppressed." We disagree. The record indicates no Fourth Amendment violation. Sergeant Gentry had ample reasonable suspicion to stop Walters. He had amassed a bevy of "articulable facts that criminal activity may be afoot" under the totality of circumstances. *State v. Evans*, 237 Ariz. 231, 234, ¶ 7 (2015) (quotation omitted); *see Fornof*, 218 Ariz. at 76, ¶ 6 (factors to consider in reasonable suspicion analysis include a suspect's conduct and appearance, the location, and surrounding circumstances, including the time of day). Gentry spotted Walters only one block from a house where a woman and two men had just fled a busted drug deal. She matched the description of the female suspect. She was black, her hair was long, and she wore a blue denim top and bottom. Gentry found her within 10 minutes of the reported escape. Two neighbors saw a suspect fleeing and pointed Sergeant Gentry in that direction, where he found Walters.

**¶17**        Nor did Sergeant Gentry violate Walters' Fourth Amendment rights by taking her photograph on a public street. Police may capture or record in public spaces what they normally may view with the naked eye. *United States v. Gonzalez*, 328 F.3d 543, 548 (9th Cir. 2003).

**¶18**        Last, Sergeant Gentry had probable cause to arrest Walters even before he took and shared her photograph. *See, e.g.*, *State v. Romero*, 178 Ariz. 45, 51 (App. 1993) (reasonable suspicion ripened into probable cause when, among other things, suspects matched description given by victims and police stopped them within short time of incident in an adjacent neighborhood). A warrantless arrest is proper "when the facts and circumstances known at the time of the arrest are sufficient to lead a reasonable person to believe a felony was committed by the person to be arrested." *State v. Hein*, 138 Ariz. 360, 364 (1983).

**¶19**        The facts and circumstances establishing reasonable suspicion here likewise demonstrate probable cause to arrest. But Sergeant Gentry had even more. He heard Walters speak in the suspect's "very thick Jamaican accent." Her conduct was suspicious, too. She handed Sergeant Gentry two forms of false identification and provided a false name. She also claimed to be hemorrhaging, but showed no physical manifestations. That was enough for a reasonable person to connect the dots. *See, e.g.*, *State v. Dixon*, 153 Ariz. 151, 153 (1987) (police officer had probable cause to arrest a man who largely matched the suspect's description, was found near the crime scene and was trying to leave the area). The Fourth Amendment did

not require Sergeant Gentry to seek photographic confirmation or greater certainty before he arrested Walters.[1]

**CONCLUSION**

¶20          We affirm the convictions and sentences of Walters.



AMY M. WOOD • Clerk of the Court
FILED:  AA

---

[1]          Walters obliquely argues the State staged an unduly suggestive pretrial lineup in violation of her Fourth Amendment rights when her photograph was shown to the confidential informant.  This argument fails because pretrial identification issues implicate the Due Process Clause, not the Fourth Amendment.  *See State v. Rojo-Valenzuela*, 237 Ariz. 448, 450, ¶ 6 (2015).