**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Hugo Eduardo BRIONES–GARZA a/k/a**
**Juan Ramirez-Ramirez,**
**Defendant-Appellant.**

No. 81–2415.

United States Court of Appeals,
Fifth Circuit.

July 16, 1982.

Certiorari Denied Oct. 12, 1982.
See 103 S.Ct. 229.

Roland E. Dahlin, II, Federal Public Defender, Karen K. Brown, George McCall Secrest, Jr., Asst. Federal Public Defenders, Houston, Tex., for defendant-appellant.

Anna E. Stool, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, POLITZ and RANDALL, Circuit Judges.

CLARK, Chief Judge:

In *United States v. Briones-Garza*, 651 F.2d 364 (5th Cir. 1981), we remanded this case to the district court to determine whether the search of a house pursuant to an arrest warrant violated the .fourth amendment rights of Hugo Eduardo Briones-Garza, an occupant of the house. On remand, the district court found that Briones-Garza lacked a sufficient expectation of privacy in the house to establish a violation of his rights and reimposed sentence. We affirm that finding but vacate the sentence and remand for further consideration.

## I.

Briones-Garza was arrested when police entered a "drop house" in Houston in search of a fugitive. "Drop house" is the vernacular for a dwelling that serves as a way station of a smuggling racket. In this venture illegal aliens were brought across the border, taken to the house in Houston, and held hostage until they or their relatives paid the smugglers additional sums of money to buy their freedom.

Three women escaped from the smugglers and went to the police. They identified Rigoberto Rodriguez, a known smuggler, as one of the men who had a part in bringing them to Houston and told the police that they had seen Rodriguez enter the drop house early that morning. Rather than procure a search warrant for the house, the police decided to act on the basis of an outstanding arrest warrant issued against Rodriguez. On entering the drop house police found over fifty illegal aliens crowded into two small rooms. They seized records of the enterprise and arrested Briones-Garza, his codefendants, and the illegal aliens.

Briones-Garza moved to suppress the evidence gathered during the search on the ground that an arrest warrant issued against Rodriguez did not justify the search of a third party's house. The district court denied the motion. Briones-Garza then waived his right to a jury and agreed to stand trial on the basis of the evidence adduced at the motion to suppress and on the stipulation that one of the aliens who had been detained would testify that Briones-Garza had checked him in, fed him and acted as a guard and that one of the officers would testify that Briones-Garza had confessed to the same acts. The district court found Briones-Garza guilty of harboring aliens and sentenced him to a three-year probated sentence beginning May 9, 1980.

On appeal, this court did not reach the issue of whether the search of the drop house violated *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). *See* 651 F.2d at 365. Instead, it remanded to determine whether Briones-Garza had a sufficient expectation of privacy in the drop house to support a fourth amendment claim.

On remand, the district court determined that Briones-Garza was himself an illegal alien who had been brought to the drop house approximately three weeks before his arrest. Because he lacked the money to buy his freedom, the smugglers allowed him to work off his debt by tending the people they brought to the house. Briones-Garza's status in the drop house was only one step removed from that of the other immigrants who were being held hostage there. Indeed, defense counsel conceded to the district court that "Briones was as much a hostage as anybody else . . . ." Although the other immigrants were not allowed to leave, Briones-Garza was apparently trusted enough that he was allowed to come and go at will. He did not, however, control the people coming into the house. He had no key and was required to admit whoever was sent.

The drop house where the immigrants were held consisted of three rooms. One room, a small bedroom, was occupied by

Poncho, the man who ran the drop house, and his wife. Briones-Garza slept on a couch in the living room and kept his belongings in a suitcase.[1] He shared the living room with two other regular occupants and approximately fifty illegal immigrants who were being held there. These immigrants filled both the living room and the remaining room in the house. The police who searched the house testified that there was "[j]ust barely enough room to walk around."

On the basis of these facts, the district court found that Briones-Garza had no reasonable expectation of privacy. Because the sentence previously imposed had been vacated on appeal, the district court reinstated the same three-year probated sentence. The new sentence, however, was to begin on the date of the hearing on remand, October 7, 1981, rather than the date Briones-Garza had originally been sentenced, May 9, 1980.

## II.

Briones-Garza contends that the district court erred in denying him standing to challenge i) his own arrest; ii) the seizure of ledgers from Poncho's bedroom; iii) the search of his own possessions; and iv) testimony about and by the illegal aliens he was guarding. Before reaching the merits of Briones-Garza's argument, it is necessary to determine exactly what evidence is at issue. While Briones-Garza has sought to suppress any use of the ledgers and his own possessions, neither was relied on by the prosecution in the district court. Although one of the officers mentioned that ledgers had been found, he never discussed their contents. Indeed, the evidence before the district court consisted of the testimony of one of the illegal immigrants and the testimony

of one of the officers that Briones-Garza had confessed to acting as a guard. Briones-Garza contends that this testimony can be suppressed as a fruit of the allegedly illegal search of the drop house.[2] See United States v. Cruz, 581 F.2d 535 (5th Cir. 1978) (en banc).

To suppress this evidence Briones-Garza must not only prove that the search of the drop house was illegal but also that, as an initial matter, he had a legitimate expectation of privacy in the drop house. See Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); Rakas v. Illinois, 439 U.S. 128, 131 n.1, 99 S.Ct. 421, 424 n.1, 58 L.Ed.2d 387 (1978). This second consideration derives from the personal nature of fourth amendment rights. A person whose privacy has not been invaded has suffered no constitutional deprivation. See Rakas v. Illinois, 439 U.S. at 133–34, 99 S.Ct. at 425–26.

Whether a person has a reasonable expectation of privacy turns on the facts of each case. See id. at 146–48, 99 S.Ct. at 432–33; United States v. Haydel, 649 F.2d 1152, 1154–55 (5th Cir. 1981). In Haydel, we found that the factors which bear on this issue include:

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

649 F.2d at 1155. Applying these factors to the case at bar, we agree with the district court that Briones-Garza lacked a reasona-

---

1. When the police arrested Briones-Garza, he was asleep in the bedroom. He testified that he slept in the bedroom that night because he was ill and that he normally slept on the couch in the living room.

2. At oral argument before this panel, Briones-Garza's counsel conceded that the conviction was not based on either the records seized or Briones-Garza's possessions. Although Briones-Garza never explicitly challenged the use of his own confession, he did challenge his own arrest. Presumably, his claim is that his

ble expectation of privacy in the drop house.[3]

Briones-Garza had neither a property nor a possessory interest in the drop house. He was, however, legitimately on the premises. He had resided at the drop house for three weeks before his arrest. Indeed, Poncho, who was in charge of the drop house, had not only permitted Briones-Garza to stay there but had required him to do so until he worked off his debt.

Briones-Garza contends that the fact of his residence was sufficient by itself to establish an expectation of privacy. While we agree that a person normally expects his residence to be private, the facts of this case belie such an argument here. *Rakas* established that in determining whether a person has a reasonable expectation of privacy, a court should eschew labels. *See* 439 U.S. at 144–48, 99 S.Ct. at 431–33. *Rakas* held that the fact that a person was "legitimately on the premises" was not necessarily dispositive of his expectations of privacy. The nature of the premises and the circumstances of the case instead reveal the extent of a person's expectations. Were we to accept Briones-Garza's claim that residence equals privacy, we would substitute the label "residence" for the rejected phrase "legitimately on the premises" in violation of *Rakas'* clear command. While residence may often be an important consideration, it is not talismanic. *See United States v. Haydel*, 649 F.2d at 1154.

In the case at bar, Briones-Garza shared his quarters with an ever changing group of approximately fifty other people who were constantly being shuttled in and out of the house. Although Briones-Garza did eat and sleep at the drop house, the place was not a residence in any normal sense of the word. It was more akin to a hotel lobby through which a constant stream of shifting people pass, rendering normal expectations of privacy virtually nonexistent. Thus, the nature of the place where Briones-Garza was required to stay does not indicate it would support any reasonable expectation of privacy on his part.

Briones-Garza argues, however, that the fact that illegal aliens were admitted to the drop house neither exposed the house to the public nor constituted a waiver of any expectations of privacy. He contends that this is so because the illegal immigrants had an interest in maintaining the secrecy of the operation. In support of his position, he relies on *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). In *Mancusi*, the Court found that a union officer had a reasonable expectation of privacy in an office shared with his colleagues. The Court noted that even though several persons shared the office, DeForte "still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission . . . ." *Id.* at 369, 88 S.Ct. at 2124. *Rakas v. Illinois*, however, demonstrates the limit of *Mancusi's* applicability. *Rakas* found that "there comes a point when use of an area is shared with so many that one simply cannot reasonably expect seclusion." 439 U.S. at 146, 99 S.Ct. at 432.[4]

confession was a fruit of his arrest which was in turn a fruit of the allegedly illegal search.

65 L.Ed.2d 619 (1980) (referring to this determination as a "factual finding").

3. Because our independent review of this issue leads us to agree with the district court, we need not decide whether the district court's finding is to be reviewed under the clearly erroneous standard. *See Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *cf. Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980) (arguably reviewing the state court's determination under the standard applied to state fact finding); *United States v. Salvucci*, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553,

4. Justice White dissented in *Rakas* on the ground that the "legitimately on the premises" test announced in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), should be retained. *See* 439 U.S. at 161–66, 99 S.Ct. at 439–42. He reiterated, however, an exception which he had previously raised in his dissent to *Mancusi*, that even a person legitimately on the premises cannot reasonably expect seclusion when he shares an area with a large number of people. *See id.* at 164, 99 S.Ct. at 441. Although the majority did not adopt

This point was more than reached in this case.

■ Unlike *Mancusi* where the office population was relatively stable, illegal aliens were constantly being brought in and taken out. The sheer volume of people passing through the drop house undercut any expectation that the illegal activities, which were manifest to anyone entering the drop house, would remain undisclosed. Moreover, Briones-Garza's assertion that he could have reasonably expected the illegal immigrants not to disclose the existence of the smuggling operation is disproved by the facts of this case. Three women escaped from the drop house and informed the police of the smugglers' activities. The fact that the smugglers took advantage of their victims' illegal status by holding them for ransom severed any community of interest that the smugglers might have shared with the immigrants. By overreaching as they did, the smugglers simply negated any expectation that these immigrants would preserve the smugglers' privacy.

■ With respect to Briones-Garza's power to exclude, the facts cut against any reasonable expectation of privacy. Briones-Garza testified that the house was always open. He had no key and he had no authority to prevent people from coming into the house. These facts are consistent with Briones-Garza's status in the house. He was little more than a hostage and was required to allow in anyone whom Poncho sent. While Briones-Garza testified that he was "in charge" during Poncho's absence, there is no indication that Briones-Garza did anything in Poncho's absence other than follow his orders.

In *United States v. Haydel*, this court found that it was reasonable to assume that a son had authority to exclude persons other than his parents and their guests from his parents' home. *See* 649 F.2d at 1155. While such an appellate court assumption may be justified in the context of a family relationship, we decline to extend it any further. In the absence of proof, we certainly cannot assume that a person has the power to exclude others when that person is little more than a hostage himself, lacks a key to the house, and must allow in whomever he is told.

Moreover, there is no indication that Briones-Garza took any precautions to maintain his privacy. Briones-Garza was brought to the drop house and required to stay there. His status as a hostage effectively precluded him from taking any independent actions. While the precautions taken by Poncho, such as erecting a high plywood fence, manifest an expectation of privacy on Poncho's part, they say nothing about the expectations of a person who is brought unknowingly to a house and required to stay there.

The final factor noted by *Haydel* is a subjective expectation that the house would remain free of governmental intrusion. *Haydel* found that this factor was established by the defendant's testimony and the precautions taken by him. *See* 649 F.2d at 1155 & n.3. There is, however, no testimony in the record that Briones-Garza expected that the drop house would be free from intrusion. To the extent that *Haydel* relied on the precautions taken as a manifestation of subjective expectation, it collapsed what it had previously characterized as two independent factors.[5] Because we have already

such a narrow approach, it agreed with the dissent that sharing an area with a large number of people would clearly diminish reasonable expectations of privacy. *See id.* at 146, 99 S.Ct. at 432.

5. *Haydel* cited *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), as one of the sources for its compilation of factors. While *Rawlings* did rely on the defendant's subjective expectation of privacy, its consideration of this factor appears to have de-

rived solely from the defendant's fortuitous admission that he did not expect a particular area to be free from governmental intrusion. *See* 448 U.S. at 104, 100 S.Ct. at 2561. Absent such an admission, it would appear that the surer course would be to focus on whether a defendant took normal precautions to maintain his privacy. This would accord with the emphasis the Court has put on an objective standard by referring to a defendant's *reasonable* expectation of privacy.

found that Briones-Garza took no precautions, there is nothing to show that he, an illegal immigrant of three weeks, had any such subjective expectation.

Our review of these factors convinces us that the district court correctly determined that Briones-Garza lacked a reasonable expectation of privacy in the drop house. There is thus no need to consider whether the search may have been illegal with respect to others.

## III.

After finding that Briones-Garza lacked a reasonable expectation of privacy, the district court reimposed the original three-year probated sentence. Because the original sentence had been vacated on appeal the court determined that the sentence should run from the date of the hearing on remand, October 7, 1981, rather than the date it was initially imposed, May 9, 1980. The court acknowledged that its decision would subject Briones-Garza to approximately seventeen more months of probation[6] but suggested that the fact that the sentence was probated rendered any error harmless.

Briones-Garza argues that the sentence imposed by the district court constituted a penalty for appealing his conviction in violation of due process. *See North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The government responds that the fact that Briones-Garza was only placed on probation rendered the district court's actions constitutional. The authority of a federal court to suspend a sentence fixed by a valid judgment and to impose a term of probation is defined in the first instance by statute. *See* 18 U.S.C. §§ 3651–3653. Our reluctance to reach a constitutional issue necessarily counsels that we first consider whether the district court's actions were consistent with its statutory powers. *See Roberts v. United States,* 320 U.S. 264, 265, 64 S.Ct. 113, 114, 88 L.Ed. 41 (1943). Because we find that

the district court failed to conform to its statutory authorization, we do not reach the constitutional issues raised by the defendant.

■ On proof of violation, a district court may revoke probation and require the defendant to serve the sentence previously imposed. *See* 18 U.S.C. § 3653; *Roberts v. United States, supra.* In such a situation, the district court need not credit the time a defendant has served on probation against the sentence initially imposed. *See United States v. DiFrancesco,* 449 U.S. 117, 136, 101 S.Ct. 426, 437, 66 L.Ed.2d 328 (1980); *id.* 101 S.Ct. at 443 (Brennan, J., dissenting); *Thomas v. United States,* 327 F.2d 795 (10th Cir.), *cert. denied,* 377 U.S. 1000, 84 S.Ct. 1936, 12 L.Ed.2d 1051 (1964).

■ This procedure reflects the purpose behind probation, which is to give the defendant a chance to prove his ability to be rehabilitated without incarceration. *See Roberts v. United States,* 320 U.S. at 273, 64 S.Ct. at 118 (Frankfurter, J., dissenting) (probation is "a reliance on the future to reveal treatment appropriate to the probationer"). If a defendant violates the conditions of his probation, a judge may decide that the sentence initially imposed is appropriate. *See generally, Gagnon v. Scarpelli,* 411 U.S. 778, 783–84, 93 S.Ct. 1756, 1760–61, 36 L.Ed.2d 656 (1973); *Roberts v. United States,* 320 U.S. at 273–74, 64 S.Ct. at 118 (Frankfurter, J., dissenting). Revocation of probation is thus a prerequisite to denying a defendant credit for time served on probation since it reflects a judgment that a probated sentence has not achieved its purpose. In the case at bar, there was no reported violation and no revocation of probation. The fact that the sentence had been vacated on appeal is not a statutory basis for the district court's decision to deny Briones-Garza credit for the time already served on probation.

6. After his conviction, Briones-Garza was returned to Mexico because of his status as an illegal alien. Even though he was outside of the United States, he was performing his probation, a condition of which was that he remain outside of the country until he was allowed to reenter legally.

Alternatively, a district court is empowered to extend or modify the period of probation not to exceed five years. *See* 18 U.S.C. § 3651; Fed.R.Crim.P. 32.1(b) (requiring a hearing and the assistance of counsel before a term or condition of probation is modified adversely to a probationer). An extension of probation does not require that a court find that any violation of probation has occurred. *See Skipworth v. United States*, 508 F.2d 598, 602 (3d Cir. 1975). The district court may, in its sound discretion, adjust the terms of probation if changed circumstances reveal that the modification is warranted. In this case, however, the district court did not extend the period of probation because of any perceived need for modification. Indeed, it is clear that the district court did not intend to extend Briones-Garza's ·probation at all since it stated that the same three-year probated sentence it had initially imposed was reimposed. The probation was "extended" only because the district court began the reimposed sentence from the date of the hearing on remand. The court reasoned, albeit incorrectly, that this later date was required by the fact that the first sentence had been vacated and was justified by the fact that any error was harmless.

While the district court had the statutory power to extend Briones-Garza's probation, it did not purport to exercise that power. Extension of probation was the effect of its actions, not the intent. Thus, the district court did not purport to rely on a statutory course which might have allowed it to achieve the result it did in fact reach. Because the district court acted outside of its statutory authorization, we vacate the sentence and remand to the district court to enter a sentence consistent with this opinion.

AFFIRMED IN PART and IN PART VACATED AND REMANDED.

---

* Judge Jack M. Gordon, District Judge of the Eastern District of Louisiana, sitting by designation, concurred in the opinion before his