UNITED STATES of America,
Plaintiff,

v.

Erasmo Vasquez VASQUEZ, aka "Erasmo Vasquez," aka "Jordan Isai Vasquez," Eusebio Mantanic Chavez, aka "Gilberto Mata," aka "Gilberto Mata Olivarez," Tomasa Macaria Ajpop, aka "Tomasa Macaria Matul Ajpop," Defendants.

No. CR 09–693 SVW.

United States District Court,
C.D. California.

March 29, 2010.

David L. Kirman, U.S. Attorney's Office, Los Angeles, CA, for Plaintiff.

Shaun Khojayan, Shaun Khojayan and Associates, Beverly Hills, CA, William R. Domnarski, William R. Domnarski Law Offices, Riverside, CA, Gregory Nicolaysen, Gregory Nicolaysen Law Offices, Encino, CA, for Defendants.

## AMENDED ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS; FINDINGS OF FACT AND CONCLUSIONS OF LAW [63]

STEPHEN V. WILSON, District Judge.

### I. INTRODUCTION AND PROCEDURAL HISTORY

On July 21, 2009, the United States ("Plaintiff" or the "United States") filed an eight-count criminal indictment against Defendants Erasmo Vasquez Vasquez ("Vasquez"), Eusebio Mantanic Chavez ("Chavez"), and Tomasa Macaria Ajpop ("Ajpop"). Count one charges Defendants for conspiracy under 8 U.S.C. § 1324(a)(1)(A)(v)(I). Counts two through eight charge Defendants with harboring and concealing seven illegal aliens for private financial gain, under 8 U.S.C. §§ 1324(a)(1)(A)(iii), (a)(1)(B)(i).

On November 2, 2009, Vasquez filed a motion seeking to suppress all evidence derived from the warrantless entry and search of the residence at 36540 Clearwood Court, Palmdale, California, 93550 ("the Clearwood Court residence") on July 8, 2009. Vasquez also sought to suppress all evidence seized during a search of the Clearwood Court residence on July 9, 2009, conducted pursuant to a warrant. Vasquez contends that: (1) the initial war-

rantless entry and search of the Clearwood Court residence was without probable cause and no exigent circumstances existed to justify the entry, and (2) the July 9, 2009 search was unlawful because the search warrant was based almost entirely on the fruits of the warrantless search the day before. On December 3, 2009, Defendant Chavez joined in Vasquez's motion to suppress.[1]

The United States contests each of the points raised by Defendants, and further argues that neither Vasquez nor Chavez had a legitimate expectation of privacy in the Clearwood Court residence, and therefore cannot challenge the warrantless entry or the subsequent search under the Fourth Amendment.

An evidentiary hearing on the motion to suppress was held on December 17, 2009. The Court allowed supplemental briefing, per Defendants' request, on the issue of standing.

Having read and considered all the evidence and argument, the Court finds that Defendants do not have standing to challenge the entry and searches of the Clearwood Court residence. Thus, the Court DENIES Defendants' motion to suppress.

## II. FACTUAL FINDINGS

The Court makes the following factual findings.

Sometime between February 5, 2009 and March 5, 2009, Defendant Vasquez illegally entered the United States with the assistance of alien smugglers, often known as "coyotes." Vasquez's ultimate destination was Florida, as he had family living there.

On March 5, 2009, a coyote known to Vasquez only by his nickname, "El Chango," brought Vasquez to the residence located at 36540 Clearwood Court in Palmdale, California ("the Clearwood Court residence"). Vasquez was brought to the Clearwood Court residence, rather than to Florida, because Vasquez had not paid the total of his smuggling fees. Vasquez's family had paid $3,000 to the smugglers, leaving a balance of $2,500.

After Vasquez had been at the Clearwood Court residence for about two weeks, he was offered a job cleaning the house and taking care of the yard to work off his smuggling debt. Vasquez was told that he would be taken to Florida after he worked off his debt. Defendants introduced no evidence as to who made Vasquez this offer.

Vasquez accepted the offer and began cleaning the house and the yard. Vasquez slept at the Clearwood Court residence every night from March 5, 2009 to July 8, 2009 and performed these tasks. Vasquez was permitted to leave the residence to do shopping and other errands for the coyotes.[2]

Vasquez was given a room to stay in at the Clearwood Court residence, which he shared with another person. The room had a door. Vasquez also kept his clothes at the residence. He did not spend the night anywhere else during the four months between March 5, 2009 and July 8, 2009.

Defendant Chavez entered the United States illegally sometime on or about March 20, 2009. Chavez was from Guatemala. On March 20, 2009, alien smugglers brought Chavez to the Clearwood Court residence, where he would stay until he could pay off his smuggling debt.

---

1. On December 21, 2009, Defendant Ajpop pled guilty to Count One, and the Court accepted the plea.

2. When Vasquez was detained and searched on July 8, 2009, officers found on Vasquez's person a set of keys that belonged to a vehicle parked at the residence.

Like Vasquez, Chavez performed various tasks or chores around the house to pay off his debt. Chavez slept at the Clearwood Court residence every night from March 20, 2009 to July 8, 2009.[3]

During this time, dozens of other illegal aliens who had been smuggled into the country were staying at the Clearwood Court residence until such time as their relatives paid their smuggling fees. As many as 30 or 40 illegal aliens stayed at the residence at any given time. During the four months that Vasquez and Chavez stayed at the Clearwood Court residence, hundreds of different people stayed overnight there. It is unclear who owned or leased the Clearwood Court residence.

On July 8, 2009, at approximately 3:00 p.m., the Los Angeles Sheriff's Department ("LASD") received a call from a man who said he was calling on behalf of an alien recently released from an "alien drop house." A transcript of the call and an audio recording was produced to the Court, and the contents of the transcript are not in dispute.

The unidentified caller described the alien drop house as a place where coyotes bring illegal aliens across the border and hold them until the aliens' relatives pay ransom for their release. The caller said that the man on whose behalf he was calling (who was in the room with the caller) had been in the drop house for a week or a month until his mom picked him up on July 7, 2009. The caller said there were still roughly thirty to forty aliens in the house. After a few minutes, the caller passed the phone to the alien who had been released from the drop house.

The alien identified himself as "Willy" and gave the officer a phone number where he could be reached. He described that there were three Hispanic men and one Hispanic woman holding illegal aliens at the drop house. The woman was the one who made the food. He didn't know the smugglers' names, only that one was called "Lacho." Willy stated that the aliens were all locked in a room and that everything in the house was sealed, including the windows and air conditioners.

Willy told the LASD officer that he did not see anyone with guns while he was in the house, but that the coyotes threatened to kill the aliens that tried to escape. The smugglers also told Willy's mother that if she did not pay the smuggling fee, they would drop Willy in the desert "you know, probably dead." Willy said he assumed the smugglers had guns, although he had not seen them. Willy then gave a physical description of the men as 5'5" and about 240 pounds.

Willy told the dispatch officer that the address of the drop house was 36540 Clearwood Court, Palmdale, CA 93500. He told the officer that there were roughly thirty to forty people still there and that three were children. Willy said every day new aliens are brought in and out. Neither Willy nor the initial caller was known to the LASD prior to the call.

On the basis of Willy's tip, the LASD sent a radio dispatch to LASD officers regarding the Clearwood Court residence. At approximately 3:00 p.m. on July 8, 2009, Deputies Reader and McGaughey received the radio dispatch in the digital terminal of their police car while they were driving around the city of Palmdale. The dispatch report included a radio code of 927c, which stands for "Check Vicinity." The dispatch report indicated that an informant named Willy had given the LASD a tip. The report contained the following

---

**3.** The record is silent as to where exactly Chavez slept. However, defense counsel proffered, without objection, that Chavez's situation was very similar to Vasquez's with regard to staying at the Clearwood Court residence. Thus, the Court will assume that Chavez slept in a room with a door and that he shared the room with another person.

information: "Poss 40 illegal immigrants inside house. 3 MH/A and FH/A keep them locked inside until their relatives pay for their release. No wpns seen, however 422'd people if they try to leave."[4] Deputies Reader and McGaughey did not receive any information other than this dispatch report. Neither Deputy Reader nor Deputy McGaughey had any previous experience with alien smuggling operations.

Deputies Reader and McGaughey arrived at 36540 Clearwood Court at approximately 3:13p.m. They observed that a typical two-story suburban residence was located at that address. Deputy Reader observed that windows in the living room and above the garage were closed or blocked by curtains, shades, or other materials such that the deputies could not see inside. One window above the front door was not blocked. Neither of the deputies heard or saw anything happening inside the house that would indicate that there was any violence occurring inside.

The deputies went to the front door. Deputy Reader knocked loudly three times. Just as he knocked the third time, Deputy Reader announced, "Los Angeles County Sheriff's Department." Then Deputy Reader heard sounds inside the house that sounded like footsteps coming down the stairs.[5] No one came to the door.

Deputies Reader and McGaughey then started to walk around the side of the house, with Deputy McGaughey leading the way. At about this time, Deputy Reader received radio traffic from Deputy Thorpe, who was positioned on a street to the rear of the house. Deputy Thorpe told Deputy Reader that a man was running away from the residence, eastbound from the house through a backyard.

Meanwhile, Deputy McGaughey came around the side of the house into the backyard and saw two persons, a Hispanic man and woman, walking quickly toward the back of the yard, where a 5–6 foot wall surrounded the yard. Deputy McGaughey told the persons to stop and come over to him, which they did. Those persons were later identified as Defendants Vasquez and Ajpop.[6] Deputy McGaughey had them sit

---

4. "3 MH/A" means three male Hispanic adults. "FH/A" means female Hispanic adult. "422" is a reference to California Penal Code § 422, which addresses criminal threats. Section 422 provides that any person who willfully threatens to commit a crime that will result in death or great bodily injury to another person, with the intent that the statement be taken as a threat, and which conveys to the person threatened "a gravity of purpose and an immediate prospect of execution of the threat" and thereby causes that person fear, shall be punished by imprisonment not to exceed one year.

5. Defendants pointed out on cross examination that Deputy Reader's contemporaneous report of the events of July 8, 2009 did not mention that he had heard sounds inside the home after knocking. However, the Court finds that Deputy Reader's testimony on this point credible.

6. There was conflicting evidence introduced as to which male Defendant (Chavez or Vasquez) was found in the backyard, versus which Defendant was later detained while running down the street. Defendant Vasquez stated in his declaration that he had been standing in the backyard when he was detained. Deputy Reader's contemporaneous report of the incident dated July 8, 2009 is consistent with that fact. The contemporaneous report stated that Defendants Ajpop and Vasquez were found in the backyard, while Defendant Chavez (aka Olivarez) was detained while running on an adjacent street. Similarly, the July 13, 2009 report of Immigration and Customs Enforcement ("ICE") agent Oladele Salaam, in which Salaam relayed information told to him by Deputies Reader and McGaughey, indicates that Defendants Vasquez and Ajpop were found in the backyard, while Defendant Chavez was detained while running away from the premises.

However, at the evidentiary hearing, Deputy Reader identified Defendant Vasquez, not Defendant Chavez, as the man he chased down the street. Deputy McGaughey could

in the backyard in a designated place. By this time, other deputies had arrived on the scene to offer back-up to Deputies Reader and McGaughey. One deputy was asked to watch Vasquez and Ajpop. Deputy McGaughey did not interview Vasquez or Ajpop. A deputy searched Defendant Vasquez and took keys found on his person, which belonged to a car in the garage at the Clearwood Court residence. There is no evidence that the deputies searched the car.

Meanwhile, Deputy Reader saw a man running down an adjacent street and chased him. The man stopped in front of a residence, and Deputy Reader ordered him to lay face down on the ground, and handcuffed him. The man was returned to the back area of the house. This person was later identified as Defendant Chavez.[7]

Several other squad cars responded to the Clearwood Court residence. Prior to any entry into the residence, there were approximately 5 or 6 squad cars surrounding the residence, and 10 to 12 deputies on the scene.

Approximately 10 to 15 minutes after Deputy Reader and McGaughey arrived at the Clearwood Court residence, and after they had detained the three suspects, the deputies decided to enter the residence. Deputies Reader and McGaughey believed that a fourth suspect may have been in the residence, given that the dispatch report had stated that there were four smugglers. The deputies thought the fourth suspect might harm the aliens they believed were being held inside the residence, or possibly destroy evidence.

Deputy Reader and McGaughey entered the residence with 3 or 4 other deputies.

They observed the living room area was strewn with clothes, shoes, and food items, and had little furniture. They found a locked security gate blocking access to the bedrooms. The deputies forced entry through the security gate and found 29 men, women, and children in several different upstairs bedrooms. The deputies also found 2 cans of pepper spray in the house. They did not find the fourth suspect.

Defendants Vasquez, Ajpop, and Chavez were detained and transported to the LASD office in Palmdale.

Immigration and Customs Enforcement ("ICE") agents then responded to the scene and interviewed all 29 persons found inside the Clearwater Court residence. Many of the aliens gave incriminating information about Defendants Vasquez and Chavez regarding their roles in the alien smuggling operation.

ICE agents arrested Vasquez and Chavez for illegal entry and later filed a criminal complaint against them for alien smuggling.

The next day, July 9, 2009, ICE Agent Oladele Salaam sought a federal search warrant for the Clearwood Court residence seeking evidence relating to the alien smuggling operation including, but not limited to: lists of names, ledgers, or other log books; bank statements; telephone records; travel documents; letters and post cards regarding smuggling; rental agreements, leases, sales receipts for property; automobiles and other materials used in the operation; property of the smuggled aliens; mail, utility bills and other documents showing control over the

---

not identify which of the two male Defendants he detained in the backyard.

The Court finds that the contemporaneous reports, which are consistent with Defendant Vasquez's testimony, more accurately report which Defendants were found in which loca-

tions. Thus, the Court finds that Defendants Ajpop and Vasquez were found in the backyard, while Defendant Chavez was the one detained while running down the street.

**7.** See *supra* note 6.

premises; and monies or proceeds from illegal smuggling activities. The affidavit in support of the search warrant relied upon the following information: (1) ICE Agent Salaam's personal experience with alien smuggling operations and alien drop houses; (2) some limited information relayed to Agent Salaam from Deputies McGaughey, Reader, and Molina regarding the tip from "Willy"; [8] (3) that no one answered the door when the deputies responded and that the deputies had seen one individual take off running and two fleeing the back yard; (4) admissions of Chavez and Ajpop as to their involvement in the smuggling operation; (5) a description of what the deputies saw upon entering the house, and (6) the statements from interviews with the aliens found at the Clearwood Court residence regarding the smuggling operation and Defendant's involvement. The Affidavit is largely based upon the information the Deputies saw when they entered the house on July 8, 2009, and the information learned from the aliens who were found during that initial entry.

On July 9, 2009, a magistrate judge signed a federal search warrant for the Clearwood Court residence. The same day, ICE agents searched the premises. They found 15 "pollo books"—records documenting the smuggling of illegal aliens—16 cell phones, 1 pager, 5 cans of pepper spray, and $2,285.00 in U.S. currency.

None of these items were found in the room where Defendant Vasquez slept.

## III. CONCLUSIONS OF LAW

### A. INITIAL WARRANTLESS ENTRY AND SUBSEQUENT SEARCHES OF THE CLEARWOOD COURT RESIDENCE

#### 1. Legitimate Expectation of Privacy

 To claim the protection of the Fourth Amendment, a defendant must establish that he has a legitimate expectation of privacy in the place searched. "A legitimate expectation of privacy encompasses two requirements: (1) the individual's subjective expectation that his activities would be private; and (2) that this expectation is one that society recognizes as reasonable." *United States v. Reyes–Bosque,* 463 F.Supp.2d 1138, 1142–43 (S.D.Cal.2006) (citing *United States v. Bautista,* 362 F.3d 584, 589 (9th Cir.2004) and *United States v. Nerber,* 222 F.3d 597, 599 (9th Cir. 2000)), *affirmed, United States v. Reyes–Bosque,* 596 F.3d 1017 (9th Cir.2010). Whether the expectation of privacy is reasonable is evaluated "either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *United States v. Silva,* 247 F.3d 1051, 1055 (9th Cir.2001) (citing *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

 The defendant challenging the search bears the burden of proving that he had a reasonable expectation of privacy. *Id.* Here, to contest the search of the Clearwood Court residence, Defendants

---

8. The paragraph regarding Willy's tip contained in the Affidavit in support of the search warrant reads, in its entirety: "On July 8, 2009, at approximately 1500 hours, the Palmdale LASD received a call from an individual who identified himself as 'Willie.' Willie said he was released by the smugglers operating out of the SUBJECT PREMISES on July 7, 2009, following the payment of previously agreed upon smuggling fees. Willie further stated that there were possibly 40 illegal immigrants locked up and being held inside the SUBJECT PREMISES by 3 male Hispanics and 1 female Hispanic until their relatives pay for their release." The Affidavit does not include the fact that Willy stated that the aliens were threatened with harm, that he believed the smugglers had guns, or that the house was sealed.

Vasquez and Chavez would have to establish that, under the totality of the circumstances, they had a reasonable expectation of privacy in the residence, and that the search violated that expectation of privacy. *United States v. Davis,* 932 F.2d 752, 756 (9th Cir.1991).[9]

The Court finds that Defendants have not met this burden.

### a. Defendants were not overnight guests

Defendants' principal argument regarding their standing to challenge the search is that they were overnight guests at the Clearwood Court residence and, as such, they had a legitimate expectation of privacy in the home. This argument lacks merit. While it is true that overnight guests generally have a reasonable expectation of privacy in their hosts' homes,[10] as explained below, Vasquez and Chavez were not overnight guests at the Clearwood Court residence.

In the seminal case *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Supreme Court established that an overnight guest has a legitimate expectation of privacy in the residence of his host. In *Olson,* the defendant was a suspect in the robbery of a gas station and the murder of the station manager. *Id.* at 93, 110 S.Ct. 1684. Police learned that Olsen had been staying in a duplex with a friend, and surrounded the house when a neighbor told them that Olsen was there. *Id.* at 93–94, 110 S.Ct. 1684. When Olson would not exit the house upon an officer's request, the police forcibly entered the house and arrested him. *Id.* at 94, 110 S.Ct. 1684.

The Court found that, as an overnight guest in his friend's home, Olson had an expectation of privacy in the home, which society recognizes as reasonable. *Id.* at 96, 110 S.Ct. 1684. The Court explained:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives.
>
> . . .
>
> The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accom-

---

**9.** The Court notes that neither Chavez nor Vasquez asserts any interest in the particular items seized from the Clearwood Court residence.

**10.** Defendants correctly argue that standing to object to a search is not limited to those

persons that have an ownership or possessory interest in the place searched. *See Jones v. United States,* 362 U.S. 257, 266–67, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). However, whether such a property interest exists is a factor to be considered in the standing analysis. *See infra* section III.A.1.b.

modating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises.... *Id.* at 98–99, 110 S.Ct. 1684. The Court ultimately concluded that because Olson's expectation of privacy was "rooted in understandings that are recognized and permitted by society," the expectation was reasonable. Thus, the Court allowed Olson to claim the protection of the Fourth Amendment. *Id.* at 100, 110 S.Ct. 1684.

Similarly, in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the Court found that Jones had a legitimate expectation of privacy in his friend's apartment. There, Jones "not only had permission to use the apartment of his friend, but also had a key to the apartment ... and kept possessions in the apartment. Except with respect to his friend, Jones had complete dominion and control over the apartment and could exclude others from it." *Rakas,* 439 U.S. at 149, 99 S.Ct. 421 (summarizing the facts in *Jones*). Jones also had slept at the apartment for a night. *Jones,* 362 U.S. at 259, 80 S.Ct. 725. Thus, the Court allowed Jones to challenge the search of the apartment. *Jones,* 362 U.S. at 267, 80 S.Ct. 725, *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).[11]

As established in *Olson, Rakas,* and *Jones,* the proposition that overnight guests generally have standing to challenge a search in their host's home is uncontroversial. Here, however, Defendants were not overnight guests at the Clearwood Court residence.

 Defendants cannot establish that they were overnight guests merely by proving that they slept overnight at the Clearwood Court residence. Rather, "[a]n 'overnight guest' is much more than someone who simply spends the night. Such status is contingent upon *an invitation by an authorized host." United States v. Gonzales–Barrera,* 288 F.Supp.2d 1041, 1050 (D.Ariz.2003) (emphasis added) (citing *Olson,* 495 U.S. at 99, 110 S.Ct. 1684); *see United States v. Rackley,* 742 F.2d 1266, 1270 (11th Cir.1984) ("[W]hile an ownership or possessory interest is not necessarily required, the mere legitimate presence on the searched premises ... is insufficient in itself to create a protectable expectation.") (quoting *United States v. Meyer,* 656 F.2d 979, 981 (5th Cir.1981)). As the Court explained in *Olson,* it is the relationship between the overnight guest and his host, and the common social understanding that comes with it, which makes the guest's expectation of privacy reasonable. 495 U.S. at 98–99, 110 S.Ct. 1684.

 Here, neither Defendant established that he was given permission to stay at the Clearwood Court residence by an authorized host. Instead, Vasquez merely testified that a person nick-named "El Chango" brought him to the Clearwood Court residence. There is no evidence in the record as to who "El Chango" is, whether he has an ownership or possessory interest in the premises, or what his

11. In *Jones,* the Court held, in part, that Jones was entitled to claim "automatic standing" to challenge the search, without regard to whether he had a reasonable expectation of privacy, because he was charged with a crime of possession. *See* 362 U.S. at 263, 80 S.Ct. 725. The automatic standing rule was subsequently overruled in *United States v. Salvucci,* 448 U.S. at 85, 100 S.Ct. 2547. Nonetheless, the *Jones* court also noted that Jones had "made out a sufficient interest in the premises." *Id.* at 265, 80 S.Ct. 725. Given the facts in *Jones*—i.e., Jones had been given a key by the owner, had complete control over the apartment when his host was away, and was permitted to sleep there and keep possessions there—it is clear that Jones was an overnight guest of an authorized host.

relationship is to the owner or lessor of the residence. Vasquez did not even establish that El Chango ever stayed at the Clearwood Court residence. Similarly, Defendant Chavez offered *no* evidence as to who brought him to the Clearwood Court residence, nor did he establish that anyone gave him permission to stay there. In sum, there is nothing in the record from which the Court could conclude that either Defendant had permission from an authorized host to stay at the Clearwood Court residence.

Moreover, the relationship between Defendants and the smugglers belies any reliance on the principles announced in *Olson.* Defendants testified that they were illegal aliens who had been smuggled into the country and forced to stay at the Clearwood Court residence until they could pay their smuggling debts. Although each Defendant was given an opportunity to work off his debt by performing household tasks, the Defendants' status in the house was little more than that of the other alien hostages. *See United States v. Briones–Garza,* 680 F.2d 417, 419, 422 (5th Cir. 1982) (illegal alien who stayed at an alien drop house and was permitted by the smugglers to work off his debt was "little more than a hostage" and did not have a reasonable expectation of privacy); *United States v. Rubio,* No. CR 08–954, 2009 WL 1125491, at *1–3 (D.Ariz., Apr. 27, 2009) (an illegal alien would not have a legitimate expectation of privacy in a residence where he was being held hostage against his will).

Thus, Defendants' situation is not at all analogous to that described in *Olson,* where an out-of-town relative, friend or colleague is invited to stay at the host's home. Here, it would be extremely unlikely that the smugglers would respect Defendants' wishes as to who to admit into the residence or who to exclude. Indeed, Vasquez testified that dozens of persons were in and out of the Clearwood Court residence almost daily. It is extremely unlikely that the smugglers consulted Defendants regarding the other aliens admitted to the residence. It is also highly unlikely that, as captors of the smugglers, Defendants had dominion or control over the residence at any time, or that they were ever left alone in the home without the smugglers present. Certainly, Defendants have produced no evidence to the contrary.

Thus, the facts of this case bear little resemblance to *Olson* or *Jones.* Defendants clearly did not have the kind of relationship with their hosts that society recognizes as creating a reasonable expectation of privacy. Absent a showing that Defendants were invited guests of an authorized host, Defendants cannot meet their burden of establishing a legitimate expectation of privacy. *See Gonzales–Barrera,* 288 F.Supp.2d at 1050.

### b. Other factors weigh against a finding of a legitimate expectation of privacy

The nature of the Clearwood Court residence also weighs heavily against any finding that Defendants had a legitimate expectation of privacy in the home. Several cases discussing one's expectation of privacy in an alien drop house confirm this conclusion.

For example, in *United States v. Briones–Garza,* the Fifth Circuit found that an alien did not have a legitimate expectation of privacy in an alien drop house. 680 F.2d 417 (5th Cir.1982). There, defendant Briones–Garza was an illegal alien who had been brought to the drop house approximately three weeks before his arrest. *Id.* at 419. He lacked the money to pay his ransom, so the smugglers allowed him to work off his debt by tending the people they brought to the house. *Id.* Unlike the other aliens,

Briones–Garza was trusted enough that he was allowed to come and go at will. *Id.* "He did not, however, control the people coming into the house. He had no key and was required to admit whoever was sent." *Id.* Briones–Garza slept on the couch in the living room and kept his belongings in a suitcase. *Id.* at 420. Further, he shared the living room with two other regular occupants and approximately 50 illegal immigrants who were being held there. *Id.* Police testified that there was just barely enough room to walk around. *Id.*

The Fifth Circuit looked to the following five factors to determine whether defendant had a legitimate expectation of privacy: (1) whether the defendant has a possessory or property interest in the thing seized or the place searched; (2) whether he has the right to exclude others from the place; (3) whether he has exhibited a subjective expectation that it would remain free from government invasion; (4) whether he took normal precautions to maintain his privacy, and (5) whether he was legitimately on the premises. *Id.* Applying these facts to Briones–Garza, the court noted that although he did not have a possessory or property interest in the drop house, he was legitimately present and had resided there for three weeks prior to the arrest. *Id.* at 421. The person who was in charge of the drop house had permitted Briones–Garza to stay there but had required him to do so until he worked off his debt. *Id.* Nonetheless, the court found that although a person "normally expects his residence to be private, the facts of this case belie such an argument here." *Id.* Specifically, the court noted:

> In the case at bar, Briones–Garza shared his quarters with an ever changing group of approximately fifty other people who were constantly being shuttled in and out of the house. Although Briones–Garza did eat and sleep at the drop house, the place was not a residence in any normal sense of the word.

> It was more akin to a hotel lobby through which a constant stream of shifting people pass, rendering normal expectations of privacy virtually non-existence.

*Id.* Thus, the nature of the drop house was such that it did not support any reasonable expectation of privacy.

The Fifth Circuit also distinguished Briones–Garza's situation from that described in *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). In *Mancusi,* the Supreme Court held that a union officer who shared an office with several colleagues could still reasonably have expected only those persons and their personal or business guests would enter the office; thus, he still had a reasonable expectation of privacy vis-à-vis the public. Citing to *Rakas v. Illinois,* 439 U.S. at 146, 99 S.Ct. 421, the court concluded: "[T]here comes a point when use of an area is shared with so many that one simply cannot reasonably expect seclusion. This point was more than reached in this case." *Id.* at 421–22. The court explained: "the sheer volume of people passing through the drop house undercut any expectation that the illegal activities, which were manifest to anyone entering the drop house, would remain undisclosed." *Id.* at 423. Finally, the court stated that Briones–Garza's role in the house supported the conclusion that no reasonable person could expect privacy-Briones-Garza was "little more than a hostage;" he had no key and could not exclude anyone from the house. *Id.* at 422. The court concluded that Briones–Garza could not challenge the search.

Similarly, in *Gonzales–Barrera,* the defendant moved to suppress certain evidence obtained during the warrantless search of an alien drop house. 288 F.Supp.2d 1041, 1045 (D.Ariz.2003). To establish standing, Gonzales–Barrera testified that he had slept at the house every

night for a month. *Id.* at 1046. An INS agent testified that it appeared that Gonzales–Barrera had "a right to be in the house and that [he] roamed the house at will." *Id.* Nonetheless, Gonzales–Barrera did not have any possessions in the house at the time of the search except the clothes he was wearing, he did not pay rent, and he admitted that people came and went at all times in the house. *Id.* at 1045. Gonzales–Barrera also admitted that he did not know who owned the house and no one ever gave him permission to stay there. *Id.*

The court found that Gonzales–Barrera had not met his burden of establishing a legitimate expectation of privacy. The Court reasoned: "Whether a legitimate expectation of privacy exists may . . . depend on a defendant's status in the home, the length of time for which the defendant was present in a house, and the use to which the house is put." *Id.* at 1048–49. First, regarding Gonzales–Barrera's status in the home, the Court noted that he could not establish a possessory or property interest in the house and did not pay rent. *Id.* at 1045. Further, Gonzales–Barrera was not an overnight guest, as he not had shown that an authorized host gave him permission. *Id.* at 1050. The use to which the house was put also undermined an expectation of privacy—that is, the house was used to harbor smuggled aliens and people came and went at all times, thus any expectation of privacy was non-existent. *See id.* at 1046. In sum, Gonzales–Barrera could not challenge a search of the residence.

In *United States v. Rubio,* the court also found that defendant lacked standing to challenge the search of an alien drop house. Case No. CR 08–954–PHX–JAT, 2009 WL 1125491 (D.Ariz., Apr. 27, 2009). Defendant Rubio was arrested during a search of the alien drop house after police received a tip that illegal aliens were being harbored there. *Id.* at *1. Rubio testified that he was one of the illegal aliens. *Id.* However, ICE agents argued that Rubio likely was one of the smugglers because he was cleaner and better dressed than the other aliens, and appeared free to leave, as he had been seen moving a car outside the residence the day before the arrest. *Id.*

Regardless of whether Rubio was an alien or a smuggler, the court found that Rubio had not established a legitimate expectation of privacy. The Court reasoned that if, in fact, Rubio was one of the illegal aliens, he "had no legitimate expectation of privacy in a home in which he claimed he was being held hostage against his will." *Id.* at *2. Further, if Rubio was a smuggler, he had not offered any evidence that "he owned, rented, or was an invited guest in the home; nor has he articulated any other theory of an expectation of privacy." *Id.* at *3. Thus, Rubio lacked standing to challenge the search. *Id.; see also United States v. Reyes–Bosque,* 463 F.Supp.2d 1138, 1143 (S.D.Cal.2006) (alien smuggler lacked standing to challenge the search of an alien drop house; even if the smuggler had stayed overnight in the residence, "he did so not as an overnight guest, but as 'caretaker' of the aliens being stashed there.") [12]

---

12. As noted above, the district court's opinion in *Reyes–Bosque* was affirmed on appeal, *United States v. Reyes–Bosque,* 596 F.3d 1017 (9th Cir.2010); however, this particular defendant, Rivas–Pozos, who stayed overnight as a caretaker for the aliens, did not appeal the district court's denial of his motion to suppress. *Id.* at 1021–22.

Nonetheless, the Ninth Circuit's standing analysis regarding Rivas–Pozos' co-defendant, Ramirez–Esqueda, is insightful. The Ninth Circuit concluded that Ramirez–Esqueda's "bald assertion" that he was an overnight guest was not sufficient to establish standing. *Id.* at 1027. Ramirez–Esqueda presented no evidence that he had personal items at the apartment, that he had stayed the night there,

Finally, while not an alien smuggling case, *United States v. Robinson*, 698 F.2d 448 (D.C.Cir.1983), supports the view that Defendants lack standing under these circumstances. In *Robinson*, the police entered a residence to arrest Howard Parker. *Id.* at 450. Parker was not present, but when police searched the home, they found defendant Robinson lying on a bed in a bedroom with stolen property. *Id.* Police recognized Robinson from an earlier robbery and arrested him. *Id.* Robison argued that the search of the home violated the Fourth Amendment.

The D.C. Circuit agreed that the search was unlawful, but concluded that Robinson had no expectation of privacy in the home. *Id.* at 454. Citing to the five factors used by the Fifth Circuit in *Briones–Garza*, the court noted that, while Robinson was legitimately on the premises, the house was "chaotic" and was being used by seven or eight people. *Id.* Further, Robison was found in a room with another person, and people came and went freely from the premises. The court found that these facts "certainly cut[ ] against normal expectations of privacy." *Id.* Additionally, the record was "disturbingly incomplete," as Robinson introduced no evidence as to whether he was living in the house, if he

had a key, or the nature of his relationship to the owner. *Id.* at 454–55. Given these facts, the court concluded that Robison did not establish a legitimate expectation of privacy in the home. *Id.* at 455.[13]

■ Here, Defendants' situation is closely analogous to the facts of *Briones–Garza, Gonzales–Barrera* and *Rubio*. Applying the five factors announced in *Briones–Garza*, the Court finds that neither Vasquez nor Chavez had a reasonable expectation of privacy in the Clearwood Court residence. First, although Defendants were legitimately present on the premises—i.e., they had been sleeping there for some time—neither Defendant had a possessory or property interest in the place searched or the things seized. There is no evidence that Defendants had a key to the residence or that they paid rent at the property. Second, there is no evidence that Defendants could exclude others from the residence, and given their status as captives, this is highly unlikely. Third, neither Defendant established that they had a subjective expectation of privacy in the areas searched. As in *Briones–Garza, Gonzales–Barrera*, and *Robinson*, the evidence demonstrated that an ever-changing group of people were in and out of the Clearwood Court residence on near-

or that he had a key to the apartment. *Id.* Further, like Defendants in this case, Ramirez–Esqueda did not establish that an authorized host had given him permission to stay at the apartment. *Id.* at 1027–28. Thus, the Ninth Circuit concluded that Ramirez–Esqueda was not an overnight guest and lacked standing to challenge the search. *Id.*

**13.** To illustrate the other end of the spectrum, in *United States v. Davis*, 932 F.2d 752 (9th Cir.1991), the Ninth Circuit held that a non-owner/non-resident of a home clearly had standing to object to a search. In *Davis*, defendant was a drug dealer who had stored massive amounts of heroin in a safe in a friend's apartment. *Id.* at 755. The apartment was leased by Andrews, who was on probation and was subject to a search condi-

tion permitting the warrantless search of her apartment. *Id.* During a search of the apartment, police officers found over 100 grams of heroin in a safe, which belonged to Davis. *Id.* Davis challenged the lawfulness of the search. *Id.*

The Ninth Circuit found that Davis had standing to challenge the search of Andrew's apartment based on the following facts: (1) he had a key to the apartment and was free to come and go as he pleased; (2) he stored things there, and took the precaution of storing them in a locked safe to assure privacy; (3) he previously lived in the apartment and had independent access to the place searched; and (4) he paid at least a portion of the rent and therefore exercised partial control over the premises. *Id.* at 757.

ly a daily basis. In fact, Vasquez testified that in the four months that he stayed at the Clearwood Court residence, "hundreds" of people passed through there. It was undisputed that generally, there were 30 to 40 people staying there at all times. (Hearing Tr. (Rough) at 32:18–25.) Photos of the interior of the residence show that the common areas were filled with clothes, shoes, and food to support the smuggling operation, and there was little furniture. Thus, although the house technically is a residence, it was not a traditional residence in any sense of the word; instead, it was "more like a hotel lobby." *Briones–Garza,* 680 F.2d at 420; *United States v. Roby,* 122 F.3d 1120, 1125 (8th Cir.1997) (hotel guest did not have a reasonable expectation of privacy in the hallway outside his hotel room). It is therefore unreasonable that Defendants had any expectation of privacy in the common areas of the house. Fourth, the fact that an alien who escaped from the Clearwood Court residence alerted the authorities further undermines any expectation that the residence would remain free from governmental intrusion. *See Briones–Garza,* 680 F.2d at 423. Finally, although Vasquez did appear to be able to leave the resi-

dence, the testimony established that he generally did so at the bidding of the smugglers. That is, Vasquez testified that he "was *sent* to do some shopping at the store." (Hearing Tr. (Rough) at 21:6–9 (emphasis added); *see* Tr. at 28:19–20 [counsel argued that Vasquez could leave the house and "run errands for the house's management."].) Moreover, even if Vasquez had the liberty to leave the house on his own accord, this fact alone is insufficient to establish standing. *See Gonzales–Barrera,* 288 F.Supp.2d at 1046, *Rubio,* 2009 WL 1125491, at *1.[14]

Finally, the Court notes that Defendant Vasquez did establish that he had been given a bedroom in the Clearwood Court residence, which he shared with one other person.[15] The room had a door, which Vasquez closed when he slept. Given these facts, Vasquez could argue that he had a subjective expectation of privacy in that bedroom.[16] Nonetheless, the evidence showed that none of the items that Defendants seek to suppress—i.e., the pollo books, the pepper spray, or the illegal aliens—were found in Vasquez's room. Thus, it is immaterial whether Vasquez had a legitimate expectation of privacy in that bedroom.[17]

14. Defendants have cited to no authority, and the Court has found none, where a smuggled alien (whether working at the subject premises or not) had a legitimate expectation of privacy in an alien drop house.

15. Defendant Chavez did not testify at the evidentiary hearing; however, counsel proffered, without objection from the Government, that Chavez's testimony would be similar to that of Vasquez. Thus, the Court will assume that Chavez also had been given a bedroom that he shared with another person. This argument applies equally, therefore, to both Defendants.

16. Although, here too, the record is deficient. For example, Vasquez did not establish that he could exclude others from the bedroom or that he expected others not to enter.

17. Defendants argue in their supplemental briefing that, assuming Vasquez had a legitimate expectation of privacy in the bedroom, such an expectation would extend to the entire home. However, Defendants' argument depends on the assumption that Vasquez and Chavez were overnight guests at the Clearwood Court residence. (Suppl. Br. at 1–2 [relying on *Olson* ].) For the reasons stated *supra,* the Court finds that Defendants were not overnight guests.

Moreover, Defendants' reliance on *United States v. $40,955.00,* 554 F.3d 752, 757 (9th Cir.2009), is misplaced. In *$40,955.00,* the court held that parents who owned and occupied a family home had standing to object to a search of their son's bedroom. The court's conclusion was based on the fact that the bedroom formed part of the home and that the parents had an ownership interest in the

In sum, it is Defendants' burden to establish that they had a reasonable expectation of privacy in the Clearwood Court residence. Given the record before the Court, Defendants have failed to meet this burden.

### 2. Lawfulness of the Initial Entry and Searches of the Clearwood Court Residence

Having concluded that Defendants did not have a reasonable expectation of privacy in the Clearwood Court residence, the Court need not reach the question of whether the warrantless entry and subsequent search violated the Fourth Amendment.

## IV. CONCLUSION

For the reasons stated, Defendants' motion to suppress evidence seized as a result of the entry and search of the Clearwood Court residence is DENIED.

The Court sets a pretrial conference for February 1, 2010, at 11:00 a.m. The Court will set a trial date at the pretrial conference.

IT IS SO ORDERED.

entire home. *Id.* at 757. Here, Defendants have not asserted any ownership interest in the Clearwood Court residence; thus, *$40,955.00* is not applicable. Further, the residence in *$40,955.00* was a traditional family home, not an alien drop house where a constant stream of people shuttled in and out every day.